UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CAROL HERRIGES, as Personal
Representative of the ESTATE OF
DIETER HERRIGES-LOVE, deceased,

                Plaintiff,                Case Number 19-12193

v.                                    Honorable David M. Lawson

COUNTY OF MACOMB,
AARON HORNE, GARY BABICH,
CORRECT CARE SOLUTIONS, LLC,
DR. LAWRENCE SHERMAN, and JAMIE
KNEISLER,

                Defendants.

_____/

## OPINION AND ORDER GRANTING MACOMB COUNTY DEFENDANTS' MOTION FOR PARTIAL DISMISSAL AND GRANTING IN PART AND DENYING IN PART CORRECT CARE SOLUTIONS'S MOTION TO DISMISS

On July 26, 2017, Dieter Herriges-Love joined the grizzly ranks of Macomb County, Michigan jail inmates who took their own lives while under the less-than-watchful eye of their jailers. In the previous sixteen years, twenty-one souls preceded him. His estate has sued the County and medical providers for violating his federal constitutional rights. The plaintiff has alleged a well-recognized cause of action under the Eighth and Fourteenth Amendments based on the defendants' deliberate indifference to Herriges-Love's serious medical needs. But the plaintiff also alleged an alternate legal theory in Count II of the amended complaint that applies a more relaxed test to determine deliberate indifference. The defendants have moved to dismiss various counts of the amended complaint, including Count II. Although the case will be allowed to move forward against all the defendants, Count II does not find support in current governing circuit law. The Court will dismiss Count II and deny the motions in all other respects.

I.

Because the motions challenge the viability of the amended complaint, the facts will be taken from that pleading.  It alleges that Herriges-Love had a history of mental illness, depression, and alcohol and drug abuse.  During a previous stay at the Macomb County Jail in September 2016, he made it known to his jailers that he was depressed and wanted to kill himself.  Clinton Township police officers took him to McLaren Hospital, filed a petition for hospitalization, and expressed concern that "as a result of [his] mental illness, [Herriges-Love] can be reasonably expected within the near future to intentionally or unintentionally seriously physically injure [him]self or others . . . ."

The statements in the amended complaint are unclear about what happened next or when he was released, but the plaintiff alleges that Herriges-Love's depression worsened; he lost his job, crashed and destroyed his car, abused drugs and alcohol, and was arrested again on October 20, 2016.  At intake, an officer documented that Herriges-Love was taking Suboxone, which is used to treat narcotics addiction, and noted that Herriges-Love recently received treatment at a mental institution for three weeks.  Officers then transported Herriges-Love to the Macomb County Jail.

At the jail, an officer partially completed a jail detention card, but he did not answer whether Herriges-Love "had any known medical problems," or if he "verbalized any thoughts of suicide."  The following day, on October 21, 2016, a Correct Care Solutions employee indicated on a screening form that Herriges-Love did not pose a suicide risk.  The day after that, Herriges-Love told personnel that he did not feel safe in the general population and requested "protective custody."  Herriges-Love also disclosed that he was taking medication prescribed by his treating psychiatrist for mental health issues, had a substance abuse problem, and was prescribed Suboxone

to help battle his addiction.  Officers placed Herriges-Love in a "high-medium" security class. Herriges-Love eventually was released from custody on October 28, 2016.

Herriges-Love had another run-in with the law several months later: he was arrested in Roseville, Michigan on July 10, 2017, and was charged with possession of a controlled substance. Officers took him again to the Macomb County Jail.

At this point, it is relevant to note that the plaintiff alleges that from 2001 through July 2017, dozens of pretrial detainees either attempted or completed suicide, many of which by slipping their bedsheets through the holes in their bunk beds and hanging themselves.  During that time, there were 21 suicides and at least seven unsuccessful attempts: five in 2001, two in 2010, five in 2011, and six in 2014.  And in 2017, ten inmates attempted suicide by hanging from their beds.  Three succeeded.

The plaintiff alleges that at the July 10 admission, the "[d]efendants again failed to require the arresting agency to complete or even partially complete a Jail Detention Card [and] no inquiry was made as to whether [Herriges-Love] 'had any known medical problems' or 'verbalized thoughts of suicide.'"  Additionally, on an "initial classification/temporary cell assignment" questionnaire, someone responded "no" to the question of whether Herriges-Love had "ever been in a mental institution or had psychiatric care," despite previous documentation that he was taking prescribed mental health medication.

Macomb County jail inmates' medical and mental health needs were the responsibility of defendant Correct Care Solutions, LLC.  That vendor entered into a contract that also required it to formulate jail policy and protocol at the Macomb County Jail "during the period in question." Defendant Lawrence M. Sherman, M.D., an employee of Correct Care, was the Chief Medical Director of the Macomb County Jail and was responsible for providing care for inmates and

training clinical staff.  Defendant Jamie Kneisler, R.N., also worked for Correct Care and performed suicide assessments at the jail for inmates, including Herriges-Love.

The plaintiff alleges that Correct Care and its employees learned during the July 10 confinement, but did not share with detention personnel, that Herriges-Love expressed feelings of hopelessness.  On July 11, 2017, the day after Herriges-Love's arrest, "[d]efendants [Correct Care,] Sherman, and/or Kneisler documented that [Herriges-Love] abused Xanax and Fentanyl" and "noted that [Herriges-Love] had a history of severe withdrawals after he stopped using drugs and alcohol."  But "[n]either Sherman nor Kneisler communicated this to the Macomb County detention personnel and [Herriges-Love] was not placed on suicide watch."  And on July 14, 2017, Correct Care documented "that [Herriges-Love] expressed feelings of hopelessness, helplessness, and . . . that there was nothing to look forward to" while a Correct Care representative completed a receiving screening form for Herriges-Love.  If an inmate expresses feelings of hopelessness, the screening form indicates that employees must notify a shift commander, refer the inmate for a mental health evaluation, and place the inmate on suicide watch.  However, after Herriges-Love reported his feelings of hopelessness, no one informed a shift commander, no one referred him for a mental health evaluation, and no one placed him on suicide watch.

Herriges-Love's condition worsened in jail.  From July 14 through July 15, 2017, Correct Care documented that he had vomiting spells, paroxysmal (sudden and intense) sweating, hallucinations, headaches, and severe anxiety.  No one informed detention personnel.  And from July 11 through July 15, 2017, Correct Care staff prescribed Herriges-Love a variety of medications, including Chlordiazepoxide (used to relieve fear, anxiety, and combat withdrawal symptoms).  But Herriges-Love was cut off from medication on July 16, 2017, which allegedly caused him to suffer from withdrawal.  The day after his round of medication ended, Herriges-

-4-

Love submitted a request for medical attention and for Imodium (abdominal discomfort medication). A nurse responded to the request and denied it — eight days later. After ending his round of medications, the Correct Care staff did not follow up with Herriges-Love. According to the plaintiff, that was a consistent company practice, as Correct Care lacked a policy requiring its medical providers to check in with patients after they are approved for general population housing.

Throughout his stay at the Macomb County Jail, Herriges-Love was housed among the general population "with little to no supervision." Aside from "perfunctory" welfare checks by detention personnel, the plaintiff alleges, inmates were relatively unsupervised and were allowed to "stick paper to their windows to block the view into their cells." "This practice permitted inmates . . . to use the restroom in private, or engage in illicit behavior." "From July 21 through July 26, 2017, numerous individuals housed with [Herriges-Love] heard him speak of suicide, observed that he appeared depressed and unkempt, knew he was experiencing withdrawals, and heard Herriges-Love state that he tried to speak with a mental health professional."

In their motion brief, the Correct Care defendants tell a different story, citing parts of Herriges-Love's medical records from the Macomb County jail, which they attached as exhibits. They contend that those records should be considered part of the pleadings because the plaintiff referred to those records and incorporated them by reference in the amended complaint. It is true that the plaintiff made passing references to the jail records, mainly the screening forms. But the records are referenced in only five (paragraphs 49 through 52, 54, and 104) of the 210 paragraphs in the amended complaint, and nowhere are they "incorporated by reference."

In any event, the Correct Care defendants contend that during the initial screening evaluation, Herriges-Love did not respond affirmatively to any of the questions that screened for suicidal tendencies. They say that they referred Herriges-Love for drug and alcohol withdrawal

protocols and recommended that he enter the medical detoxification unit due to his admitted drug and alcohol use.  They also dispute that Herriges-Love expressed feelings of hopelessness.  They contend that the plaintiff's allegation is "an apparent reference to [Herriges-Love's] 'CIWA-AR SCORE SHEET,'" which they also attached to their motion to dismiss.  On the CIWA score sheet, the medical evaluator "made a single line through the four behavioral health questions that went slightly from right to left barely touching the 'yes' box for the last question."  According to the Correct Care defendants, "[i]t is clear that [the evaluator] intended to make a single line through 'no' for all four questions."  Finally, they say that defendant Kneisler conducted a medical history and physical assessment of Herriges-Love on July 21, 2017.  The defendants allege that she asked Herriges-Love if he ever attempted suicide or if he recently attempted suicide, to which he responded "no."  Moreover, "she recorded that his orientation was 'alert, oriented,' his affect was 'appropriate,' his speech 'appropriate,' his activity behavior was 'appropriate,' and his thought process was 'logical.'"

Herriges-Love committed suicide on July 26, 2017.  He became the twenty-second suicide at the jail since 2001 and the third suicide within a span of two-and-a-half months.

That morning, deputies Abraham Sobh and Brent Whitney entered Herriges-Love's unit, including his cell, around 7:30 a.m. to perform a welfare check.  Everything appeared normal. About an hour later, "Deputy Sobh performed a perfunctory welfare check."  He walked through the general jail unit "without looking inside the cells or checking on [Herriges-Love], and exited . . . only 44 seconds later."  Herriges-Love's roommate left their cell to be transported to a court proceeding about 20 minutes later.  Right about the time when Deputy Sobh performed his welfare check and Herriges-Love's roommate left, an inmate observed that the window of Herriges-Love's cell door had been covered with paper, blocking the view.

At around 10:15 a.m., defendant Babich performed another "perfunctory welfare check." He entered the unit, did not check any cells, and exited 17 seconds later. Although Herriges-Love's window was covered with paper, defendant Babich did not check on him. Babich performed another check about 50 minutes later. During that check, defendant Babich noticed that Herriges-Love's window was covered, but again left without checking on him. Deputy Sobh performed a welfare check about an hour later, at 12:02 p.m. He entered Herriges-Love's room and discovered that Herriges-Love had committed suicide by hanging himself from his bed with a jail-issued bed sheet.

On July 25, 2019, Herriges-Love's estate sued Macomb County, Sherriff Aaron Horne, Officer Gary Babich, Correct Care Solutions, LLC, Dr. Lawrence Sherman, and Jamie Kneisler under 42 U.S.C. § 1983 and state law for his wrongful death. The amended complaint contains seven counts: alternative counts against all defendants for violation of the Eighth and Fourteenth Amendments under a deliberate indifference theory (Counts I and II); violation of the Eighth and Fourteenth Amendments under a failure-to-train theory against the Macomb County defendants (Count III); violation of the Eighth and Fourteenth Amendments under policy and custom theories against Macomb County and CCS (Counts IV and V); violation of the Eighth and Fourteenth Amendments under a conditions-of-confinement theory against the Macomb County defendants (Count VI); and gross negligence against the CCS defendants (Count VII). The defendants answered the amended complaint and also filed motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). All defendants attack Count II, and the CCS defendants move to dismiss Counts IV, V, and VII.

II.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). A "claim is facially plausible when a plaintiff 'pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Matthew N. Fulton, DDS, P.C. v. Enclarity, Inc.*, --- F.3d ---, No. 17-1380, 2020 WL 3393774, at *3 (6th Cir. June 19, 2020) (quoting *Iqbal*, 556 U.S. at 678). When reviewing the motion, the Court "must 'construe the complaint in the light most favorable to the plaintiff[] [and] accept all well-pleaded factual allegations as true.'" *Id.* at 951 (quoting *Hill v. Snyder*, 878 F.3d 193, 203 (6th Cir. 2017)).

When deciding a motion under Rule 12(b)(6), the Court looks only to the pleadings. *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008). The Court also may consider the documents attached to them, *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007) (citing Fed. R. Civ. P. 10(c)), documents referenced in the pleadings that are "integral to the claims," *id.* at 335-36, documents that are not mentioned specifically but which govern the plaintiff's rights and are necessarily incorporated by reference, *Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997), *abrogated on other grounds by Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002), and matters of public record, *Northville Downs v. Granholm*, 622 F.3d 579, 586 (6th Cir. 2010); *see also Cates v. Crystal Clear Tech., LLC*, 874 F.3d 530, 536 (6th Cir. 2017) (instructing that "'[w]hen a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations.'") (quoting *Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012)). However, beyond that, assessment of the facial sufficiency of

the complaint ordinarily must be undertaken without resort to matters outside the pleadings. *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010).

A.

The plaintiff's federal claims invoke 42 U.S.C. § 1983, which provides a vehicle for individuals to seek redress in court for violations of rights secured by the Constitution and laws of the United States.  To state a claim under that section, a plaintiff must plead facts that demonstrate "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009) (quoting *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006)). For the federal right, the plaintiff relies on the Eighth Amendment's ban on cruel and unusual punishment and its application to pretrial detainees through the Fourteenth Amendment.

It is widely accepted that the government has an obligation to furnish appropriate medical care for both convicted defendants and detainees alike.  For convicted defendants, that obligation derives from the Eighth Amendment.  *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).  The Cruel and Unusual Punishment Clause of that Amendment applies, at least to convicted prisoners, the reasoning goes, because that Clause prohibits "punishments which are incompatible with the evolving standards of decency that mark the progress of a maturing society"; and "denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose"; and "[t]he infliction of such unnecessary suffering is inconsistent with contemporary standards of decency"; and therefore "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle*, 429 U.S. at 102-04 (citations and quotation marks omitted).

In *Farmer v. Brennan*, 511 U.S. 825 (1994), the Supreme Court defined the term "deliberate indifference" when used in conditions-of-confinement cases as the equivalent of criminal recklessness. *Id.* at 837. To satisfy that element in such cases, a plaintiff must plead and prove that the prison "official knows of and disregards an excessive risk to inmate health or safety." *Id.* at 837. That culpable state of mind exists when "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he . . . also draw[s] the inference."

Applying that Eighth Amendment test to pretrial detainees' claims could be problematic, however, since "pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'" *Kingsley v. Hendrickson*, 576 U.S. 389, 400-01 (2015) (citing *Ingraham v. Wright*, 430 U.S. 651, 671-672, n. 40 (1977)). And for detainees, whose rights include protections that are at least as substantial as the Eighth Amendment protections available to a convicted prisoner, *Jones v. Blanas*, 393 F.3d 918, 933-34 (9th Cir. 2004) (holding that civil detainees are entitled to superior conditions of confinement than prisoners and pretrial detainees), the Due Process Clause sets the standard, *see City of Revere v. Massachusetts Gen. Hosp*., 463 U.S. 239, 244 (1983). Nonetheless, in this circuit, claims relating to health concerns by detainees are analyzed using an Eighth-Amendment, deliberate-indifference framework. *Watkins v. City of Battle Creek*, 273 F.3d 682, 685-86 (6th Cir. 2001).

That conventional framework, then, requires the detainee to prove two elements. *Farmer*, 511 U.S. at 837-38. First, the petitioner must demonstrate that the constitutional deprivation was "objectively, 'sufficiently serious.'" *Ibid*. (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). Second, he must demonstrate that the detention official had a "sufficiently culpable state of mind." *Ibid*. This element can be proven by circumstantial evidence from which the factfinder can

-10-

conclude that the state actor perceived the risk, *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001), or "from the very fact that the risk was obvious." *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002).

No one quarrels with the idea that the plaintiff has pleaded facts in Count I of the amended complaint that establish those elements. The defendants take issue, however, with the alternative iteration of the deliberate indifference claims stated in Count II. Relying heavily on *Kingsley v. Hendrickson*, the plaintiff alleges that because Herriges-Love was a pretrial detainee, she need only prove the objective component of deliberate indifference, and that she need not prove that the defendants had a culpable state of mind.

*Kingsley* was an excessive force case in which the plaintiff appealed an unfavorable verdict after the jury was instructed that he had to prove that the jail guards acted "with reckless disregard of plaintiff's rights," *Kingsley*, 576 U.S. at 394, meaning that the guards "were *subjectively* aware that their use of force was unreasonable," *id.* at 392. The Court noted that proof of intentionality is required for commission of the act of force, since "'liability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process." *Id.* at 396 (quoting *Cty. of Sacramento v. Lewis,* 523 U.S. 833, 849 (1998)). But when it comes to proving a defendant's understanding that the force used was excessive, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 396-97.

The plaintiff argues that this same standard should apply to claims by pretrial detainees complaining about a jailer's deliberate indifference to serious medical needs. The Sixth Circuit has suggested that *Kingsley* may justify reconsideration of circuit precedent on that point. *See Richmond v. Huq*, 885 F.3d 928, 938 n.3 (6th Cir. 2018) ("[W]e recognize that [*Kingsley*'s] shift in Fourteenth Amendment deliberate indifference jurisprudence calls into serious doubt whether

Richmond need even show that the individual defendant-officials were subjectively aware of her serious medical conditions and nonetheless wantonly disregarded them."). Other circuits are split on the question. *Compare Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018) (*Kingsley* applies); *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1120, 1122–25 (9th Cir. 2018) (applies); and *Bruno v. City of Schenectady*, 727 F. App'x 717, 720–21 (2d Cir. 2018) (applies); *with Whitney v. City of St. Louis*, 887 F.3d 857, 860 n.4 (8th Cir. 2018) (*Kingsley* does not apply); *Nam Dang v. Sheriff, Seminole Cty. Fla.*, 871 F.3d 1272, 1279 n.2 (11th Cir. 2017) (does not apply); *Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415, 419 n.4 (5th Cir. 2017) (does not apply).

There are reasons not to apply *Kingsley*, an excessive force case, to a deliberate indifference claim. For one, excessive force requires proof of an affirmative act; denial of medical care generally is an act of neglect. Requiring proof of subjective intent corresponds with the rationale that such treatment must equate with punishment and that the Supreme Court never intended to constitutionalize medical malpractice committed by prison doctors. *Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). The Ninth Circuit rejected that distinction in a failure-to-protect case. *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016) ("[T]here are significant reasons to hold that the objective standard applies to failure-to-protect claims as well."). That view, however, is not universally accepted. *See Nam Dang*, 871 F.3d at 1279 n.2.

More to the point, though, requiring proof of subjective intent in deliberate indifference cases remains the law of the Sixth Circuit, which district courts are bound to apply. *Richmond* notwithstanding, the court of appeals in later cases has not moved away from the subjective intent requirement for deliberate indifference claims. *See Berkshire v. Beauvais*, 928 F.3d 520, 534 (6th Cir. 2019) ("A claim based on deliberate indifference to a serious medical need has an objective

and a subjective prong"); *Korthals v. Cty. of Huron*, 797 F. App'x 967 (6th Cir. 2020) (noting that the plaintiff "properly recited the [deliberate indifference] test as requiring the plaintiff to show both an objective substantial risk of serious harm . . . [and] that the prison official subjectively knew of and deliberately disregarded that risk") (citations omitted); *McCain v. St. Clair Cty.*, 750 F. App'x 399, 403 (6th Cir. 2018).

For her denial-of-medical-care claim, the plaintiff must plead that the defendants were deliberately indifferent to the decedent's serious psychiatric needs ("[t]he clearly established right to be free from deliberate indifference to medical needs extends to an inmate's psychiatric needs, *Richmond*, 885 F.3d at 937 (citing *Comstock*, 273 F.3d at 702)) by showing that the medical condition was objectively serious and that the defendants had a culpable state of mind when the care was denied or withheld. *Richmond*, 885 F.3d at 937-38. Because Count II of the amended complaint seeks to omit the element of subjective intent, it must be dismissed for failure to state a claim.

## B.

The Correct Care defendants argue that the Court should dismiss Counts IV (unlawful custom of laxity) and V (inadequate suicide precautions) because the plaintiff merely asserted legal conclusions without articulating how the inadequate and unlawful policies were the moving force behind the alleged constitutional violations.

Correct Care itself contracted with Macomb County to provide medical services to jail inmates, a traditional state function. Therefore, it is subject to liability under 42 U.S.C. § 1983 in the same way a municipality is subject to liability. *Winkler v. Madison Cty.,* 893 F.3d 877, 904 (6th Cir. 2018). Municipalities cannot be held liable under section 1983 solely for the acts of their agents; they are accountable under that statute for their own conduct. *Monell v. Dep't of Soc.*

*Servs.*, 436 U.S. 658, 691 (1978) (holding that "a a municipality cannot be held liable [under section 1983] solely because it employs a tortfeasor — or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory"). The plaintiff, therefore, must point to an official policy, custom, or practice of that contractor as the source of the constitutional violation. *Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005). And she must allege facts that show a causal connection between the policy and the injury. *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997); *Heyerman v. Cty. of Calhoun*, 680 F.3d 642, 648 (6th Cir. 2012).

"A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). The absence of a written policy endorsing the constitutional violation is not fatal to a claim. "Section 1983 'authorizes suit "for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels."'" *Cash v. Hamilton Cnty. Dep't of Adult Probation*, 388 F.3d 539, 542-43 (6th Cir. 2004) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988)). To sustain municipal liability under that theory, a plaintiff must "prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Id.* at 543 (citation and quotation marks omitted).

The plaintiff's main theory of recovery against Correct Care in Count IV is that it "evidenced a custom of laxity by failing to refer pretrial detainees with known mental health issues

to Qualified Mental Health Professionals for thorough suicide risk assessments." Am. Compl. ¶ 157, ECF. No. 23, PageID.236. The plaintiff alleges a separate but related theory of recovery in Count V that Correct Care adopted a classification policy for inmates that was so inadequate that its screening practices regularly failed to detect inmates who were obvious suicide risks. That policy and practice was evidenced by use of a computerized questionnaire that prepopulated "No" answers to critical questions, allowing nurses to avoid asking questions that would reveal suicidal tendencies, and not requiring its untrained personnel to refer vulnerable inmates to qualified health care professionals. Am. Compl. ¶¶ 178-184, ECF. No. 23, PageID.241-242.

To plead sufficiently that a defendant had a custom of acquiescence or inaction, the plaintiff must allege:

> (1) "a clear and persistent" pattern of unconstitutional conduct by [the defendant's] employees; (2) the [defendant contractor's] "notice or constructive notice" of the unconstitutional conduct; (3) the [defendant's] "tacit approval of the unconstitutional conduct, such that [its] deliberate indifference in [its] failure to act can be said to amount to an official policy of inaction"; and (4) that the policy of inaction was the "moving force" of the constitutional deprivation, such that the plaintiff's constitutional injury was directly caused by the conduct of the [defendant] rather than simply by the conduct of the [defendant's] employee.

*D'Ambrosio v. Marino*, 747 F.3d 378, 387-88 (6th Cir. 2014) (quoting *Doe v. Claiborne Cty.*, 103 F.3d 495, 508 (6th Cir. 1996)). "The evidence must show that the need to act is so obvious that the [defendant's] 'conscious' decision not to act can be said to amount to a 'policy' of deliberate indifference to [the plaintiff's] constitutional rights." *Doe*, 103 F.3d at 508 (applying standard to high school student's claim for deliberate indifference sexual abuse). "'Deliberate indifference' in this context . . . means evidence showing an obvious, deliberate indifference to [serious medical needs]." *Ibid.*

In both Counts IV and V, the plaintiff sufficiently has pleaded a *Monell* claim alleging a policy, custom, and practice of deliberate indifference to the psychological needs of suicide-prone

inmates.  First, the plaintiff has pleaded a "clear and consistent pattern of unconstitutional conduct by [the defendant's] employees."  *D'Ambrosio,* 747 F.3d at 387-88.  She has alleged that "[f]or years, [d]efendant [Correct Care] tolerated abrupt stops in medical care for inmates experiencing withdrawals from drugs and alcohol, without requiring its medical providers to follow-up with patients placed in general population housing."  Am. Compl. ¶ 156, ECF No. 23, PageID.237. "Instead, [Correct Care] had an unwritten policy that almost exclusively relied on the reports of other inmates and correctional officers to notify medical providers if their patient's mental health was deteriorating."  *Id.* ¶ 62, ECF No. 23, PageID.207.  The plaintiff also alleged that "[t]o save time and money, [Correct Care] evidenced a custom of laxity by failing to refer pretrial detainees with known mental health issues to Qualified Mental Health Professionals for thorough suicide risk assessments."  *Id.* ¶ 157, ECF No. 23, PageID.237.  The plaintiff therefore sufficiently pleaded that this "unwritten policy" of deliberately ignoring the serious medical needs of inmates constituted a clear and consistent custom of unconstitutional acquiescence or inaction. *D'Ambrosio,* 747 F.3d at 387-88.

Second, the plaintiff sufficiently pleaded that Correct Care had "'notice or constructive notice' of the unconstitutional conduct."  *Ibid.*  She asserted that Correct Care "tolerated abrupt stops in medical care for inmates experiencing withdrawals from drugs and alcohol, without requiring its medical providers to follow-up with patients placed in general population housing" "for years."  Am. Compl. ¶ 156, ECF No. 23, PageID.237.  To demonstrate constructive notice of the ongoing problems, the plaintiff emphasized that Herriges-Love was the twetnty-second suicide at the jail since 2001 and the third suicide within a span of two-and-a-half months.  *Id.* ¶¶ 21, 33, ECF No. 23, PageID.198, 201.  Although the plaintiff did not explicitly state that Correct Care was actually aware of these suicides, it can be inferred that the jail's medical care provider knew

about the deaths of their patients and jail's general track record.  The occurrence of suicides pleaded in this case (about ten every eight years) is more than twice as frequent as the four *Brady* violations per decade that the Supreme Court held was insufficient to demonstrate notice of ongoing constitutional violations.  *See Connick v. Thompson*, 563, U.S. 51, 61 (2011); *see also Gray v. City of Detroit*, 399 F.3d 612, 619 (6th Cir. 2005) (finding that only two inmate suicides in an eight-year period insufficient to establish notice of a pattern of constitutional violations).

Third, the plaintiff sufficiently pleaded that Correct Care approved "of the unconstitutional conduct, such that [its] deliberate indifference in [its] failure to act can be said to amount to an official policy of inaction."  *D'Ambrosio*, 747 F.3d at 387-88.  She alleged that Correct Care maintains a ubiquitous, unofficial policy of inaction regarding its patients' serious health conditions and warning signs for suicide. Am. Compl. ¶¶ 154-157, ECF No. 23, PageID.236-37. The plaintiff described the history of frequent and consistent suicides at the Macomb County Jail, the defendant's use of unqualified employees, and the failure to review online medical records. *Id.* ¶¶ 21-26, 31-32, 68-69, 104, ECF No. 23, PageID.198-201, 209, 219-220.  Those fact allegations support the conclusory statement that Correct Care's "conduct constituted and/or evidenced a custom of laxity regarding the supervision and monitoring of the health and safety of inmates, pretrial detainees, and the jail premises, which custom was or became a *de facto* policy." *Id.* ¶ 158, ECF No. 23, PageID.237.  The amended complaint, therefore, pleaded facts, accepted as true, sufficient to show that Correct Care had a company-wide policy of unconstitutional indifference to their patients' medical needs.

Finally, the plaintiff pleaded that "that the policy of inaction was the 'moving force' of the constitutional deprivation."  *D'Ambrosio*, 747 F.3d at 387-88.  She alleged that "[a]s a direct and proximate result of this custom of laxity, [Herriges-Love] suffered and was deprived of his life

-17-

without due process of law." Am. Compl. ¶ 160, ECF No. 23, PageID.237.  Moreover, the plaintiff alleged that had Correct Care actively followed up with patients in general population housing with known risks of suicide, "a different outcome with respect to [Herriges-Love]'s medical care and supervision would have resulted."  *Id.* ¶ 172, ECF No. 23, PageID.240.

It is true that "very few cases have upheld municipality liability for the suicide of a pre-trial detainee." *Gray*, 399 F.3d at 619.  *Simmons v. City of Philadelphia* is one of them.  947 F.2d 1042 (3d Cir. 1991).  There, the plaintiff's decedent, who was arrested for public intoxication, was placed in a cell by himself and hanged himself with a noose made from his pants.  *Id.* at 1048.  In the previous five years, twenty inmates had committed suicide; fifteen had been arrested for public intoxication.  *Id.* at 1074.  Because the city policymakers were aware of this "profile" of typical suicidal detainees and failed to provide even minimal training for all its turnkey officers in how to recognize and respond to the profile, the Third Circuit held that there was sufficient evidence to support the jury's finding of municipal liability.  *Id.* at 1075-76.

In *Gray*, the Sixth Circuit reached the opposite conclusion on different facts at the summary judgment stage of the case.  *Gray*, 399 F.3d at 619.  The Sixth Circuit distinguished *Simmons* and held that the plaintiff failed to provide evidence that the City of Detroit's policy of inadequate training was the "moving force" behind the violation of the decedent's constitutional rights.  *Id.* at 616-17.  "There was no 'profile' that warned officials that plaintiff was a suicide risk [and it was] undisputed that the city produced and disseminated constitutionally adequate policies regarding monitoring for and prevention of suicidal behavior."  *Id.* at 618.  Of the eight deaths in "various holding facilities" in eight years, "only two were suicides, with one occurring in 1998 and 1999."  *Id.* at 619.  "[T]he plaintiff never made any statements that could reasonably be interpreted as

threatening to harm himself, and none of his destructive acts were self-directed. There was no indication that he would turn his anger and agitation upon himself." *Ibid*.

This case is closer to *Simmons* than to *Gray*. First, there is a distinct pattern here. Unlike *Gray*, the plaintiff has pleaded that "[a]rchaic and outdated communication practices and the inept privatization of mental health services has culminated in disregarding cries for help from pretrial detainees who have repeatedly utilized holes in their bunks and jail-issued bed sheets to attempt and complete suicide." Am. Compl. ¶ 3, ECF No. 23, PageID.194. Although the amended complaint does not indicate how many individuals died by hanging themselves from their bunks, it did allege that 22 inmates committed suicide within sixteen years, three of which occurred within two-and-a-half months of Herriges-Love's death. *Id.* ¶¶ 21-24, 28-29, 33, ECF No. 23, PageID.198-201; *see Grabow v. Cty. of Macomb*, 580 F. App'x 300, 314 (6th Cir. Aug. 29, 2014) (Donald, J. Concurring) ("the suicides keep happening . . . How many times should Macomb County come before this Court before the need for better training becomes so obvious that it should be held liable?") (citations omitted) (affirming summary judgment for defendants on qualified immunity grounds).

Second, unlike in *Gray*, there is a dispute at the pleading stage over whether CCS "produced and disseminated constitutionally adequate policies regarding monitoring for and prevention of suicidal behavior." *Gray*, 399 F.3d at 618. The plaintiff here alleges the exact opposite: "[t]o save time and money, [Correct Care] utilized a computer program which pre-populated Herriges-Love's answers pertaining to his mental health in the negative." Am. Compl. ¶ 178, ECF No. 23, PageID.241. The plaintiffs contended this policy was ineffective because (1) "it failed to require [Herriges-Love]'s intake nurse to ask [Herriges-Love] if he was currently suicidal or planning to commit suicide"; (2) "it failed to require [Herriges-Love]'s intake nurse to

refer [Herriges-Love] to a Qualified Mental Health Professional for a suicide risk assessment;" (3) "it permitted inexperienced and unqualified employees to ascertain and identify the mental health needs of pretrial detainees;" (4) "it did not require staff to refer inmates, including [Herriges-Love], to Qualified Mental Health Professionals so long as they were seen by a Qualified Mental Health Professional at some point in the past;" and (5) "did not require staff to review medical records of inmates, including [Herriges-Love], even though the records were stored electronically in [Correct Care's] computer system." *Id.* ¶¶ 179-183, ECF No. 23, PageID.241-242. "Had [Correct Care] implemented adequate classification policies and required [its employees] to refer [Herriges-Love] to a Qualified Mental Health Professional, or obtain and review [Herriges-Love]'s medical history, a different outcome with respect to [Herriges-Love]'s medical care and housing classification would have resulted." *Id.* ¶ 184, ECF No. 23, PageID.242.

Finally, unlike in *Gray*, the plaintiff's decedent did make "statements that could reasonably be interpreted as threatening to harm himself." *Gray*, 399 F.3d at 619. Correct Care had access to Herriges-Love's records from 2016, which indicated that he was treated by a psychiatrist "and was involuntarily committed to a mental institution for three weeks for suicide ideation." Am. Compl. ¶ 184, ECF No. 23, PageID.242. And the plaintiff alleged that, on July 14, 2017, Correct Care documented "that [Herriges-Love] expressed feelings of hopelessness, helplessness, and . . . that there was nothing to look forward to," but no one informed a shift commander, no one referred him for a mental health evaluation, and no one placed him on suicide watch. *Id.* ¶¶ 50-53, ECF No. 23, PageID.205-206.

The defendant pushes back on these allegations, pointing to a document that is neither attached to nor incorporated by reference into the amended complaint, Herriges-Love's "CIWA-AR SCORE SHEET." That document does not undercut the allegations in the amended complaint

at this stage of the case. And even if it were considered properly here, it shows that the medical evaluator made a single line through the four behavioral health questions that went slightly from right to left, checking the "yes" box for the last question. ECF No. 32-2. According to the Correct Care defendants, "[i]t is clear that [the evaluator] intended to make a single line through 'No' for all four questions." *Ibid.* But it is far from "clear"; the check box question asks whether the patient "[e]xpresses feelings there is nothing to look forward to (Feelings of hopelessness/helplessness [sic]." It appears that the "yes" box was checked. The defendants' insistence that the mark was made in error must be sorted out through discovery. At this stage of the case, the Court "must 'construe the complaint in the light most favorable to the plaintiff[] [and] accept all well-pleaded factual allegations as true.'" *Matthew N. Fulton, DDS, P.C.*, 2020 WL 3393774, at *3 (quoting *Iqbal*, 556 U.S. at 678).

The plaintiff sufficiently pleaded a *Monell* claim against the Correct Care defendants in Counts IV and V of the amended complaint.

## C.

The Correct Care defendants also argue that Count VII (state law gross negligence) should be dismissed because (1) Michigan does not recognize a cause of action for gross negligence, and (2) the plaintiff's state law claims sound in medical practice and are therefore governed by a state procedural statute that requires plaintiffs to attach to the complaint an affidavit of merit signed by a healthcare professional attesting to the defendants' failure to meet the applicable standard of care.

There is no free-standing claim of "gross negligence" recognized by Michigan law. Allegations of gross negligence derive their relevance from the need to plead around certain defenses. Before the adoption of comparative negligence (and the rejection of the harsh

consequences of the contributory negligence defense), allegations of gross negligence were necessary to excuse a plaintiff's antecedent negligence where the injury was alleged to have been caused by the defendant's subsequent negligence. *Gibbard v. Cursan,* 225 Mich. 311, 319, 196 N.W. 398, 400-01 (1923), *overruled by Jennings v. Southwood*, 446 Mich. 125, 131-132, 521 N.W.2d 230 (1994); *Fuga v. Comerica Bank–Detroit,* 202 Mich. App. 380, 383, 509 N.W.2d 778, 780 (1993). "Common-law gross negligence is not a higher degree of negligence, but rather ordinary negligence of the defendant that follows the negligence of the plaintiff." *Xu v. Gay*, 257 Mich. App. 263, 267-68, 668 N.W.2d 166, 169 (2003) (citing *Jennings,* 446 Mich. at 130, 521 N.W.2d at 233).

In contemporary Michigan jurisprudence, allegations of gross negligence are necessary to plead around the defense of governmental immunity. *See* Mich. Comp. Laws § 691.1407(2). Although the Governmental Tort Liability Act includes a definition of "gross negligence," Mich. Comp. Laws § 691.1407(8)(a) ("'Gross negligence' means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results."), it did not create a new cause of action for gross negligence, *Rakowski v. Sarb*, 269 Mich. App. 619, 627, 713 N.W.2d 787, 794 (2006) (citing *Beaudrie v. Henderson*, 465 Mich. 124, 134, 631 N.W.2d 308, 313 (2001)). Instead, claims labeled "gross negligence" are assessed as claims of ordinary negligence, "using traditional tort principles without regard to the defendant's status as a government employee." *Id.* at 628, 713 N.W.2d at 794 (quoting *Beaudrie*, 465 Mich. at 134, 631 N.W.2d at 313).

"Traditional tort principles" require a plaintiff bringing a negligence claim to allege a duty, breach of duty, causation, and damages. *Diem v. Sallie Mae Home Loans, Inc.*, 307 Mich. App. 204, 214 859 N.W.2d 238, 243-44 (2014). Under Michigan law, some negligence claims must be treated as medical malpractice claims, subject to more exacting procedural requirements.

Although the plaintiff insists that she does not intend to proceed against the Correct Care defendants under a medical malpractice theory, those defendants contend that Count VII can only be read as such a claim. The Court agrees. A negligence claim sounds in medical malpractice if it "pertains to an action that occurred within the course of a professional relationship," and it "raises questions of medical judgment beyond the realm of common knowledge and experience." *Bryant v. Oakpointe Villa Nursing Ctr.*, 471 Mich. 411, 422, 684 N.W.2d 864, 871 (2004). Both elements are present here.

"A professional relationship exists if a person or an entity capable of committing medical malpractice was subject to a contractual duty to render professional health-care services to the plaintiff." *Kuznar v. Raksha Corp.*, 481 Mich. 169, 176-77, 750 N.W. 2d 121, 126 (2008). The plaintiff has alleged that the Correct Care defendants were providing medical services to Macomb County jail inmates under such a contract. And the claims of negligence regarding Correct Care's treatment of Herriges-Love's mental health issues and suicidal tendencies "pose[] questions of medical judgment outside the realm of common knowledge and experience." *Ibid.*

Viewing Count VII as a medical malpractice claim, the Correct Care defendants argue that it must be dismissed because the plaintiff did not attach to the amended complaint an affidavit of merit signed by a health professional attesting to the defendants' failure to meet the standard of patient care as required by Michigan Compiled Laws § 600.2912d. But it has been settled for some time that the Michigan statute outlines a pleading requirement that does not apply to an action in federal court. *Long v. Adams*, 411 F. Supp. 2d 701, 705-07 (E.D. Mich. 2006) ("As is clear from [Federal Rule of Civil Procedure] 8(a)'s language, there is no requirement that any affidavit of merit must be filed to commence a medical malpractice case in federal court . . . The presence or absence of an affidavit does not render the complaint defective or subject it to dismissal.").

More recently, that rule was confirmed by the Sixth Circuit, where it held that a plaintiff filing a complaint in a federal court "does [not] need an affidavit of merit to state a claim for medical negligence[.]  *Gallivan v. United States*, 943 F.3d 291, 293 (6th Cir. 2019) (citing *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010) (majority opinion)).

Because the absence of an affidavit of merit is the only flaw cited by the Correct Care defendants on Count VII of the amended complaint, their motion to dismiss that count will be denied.

III.

The defendants have argued correctly that Count II of the amended complaint is deficient because it does not allege the subjective component of a deliberate indifference claim brought under the Eighth and Fourteenth Amendments.  However, the plaintiff adequately alleged such a claim in Count I, and Counts IV, V, and VII state claims for which relief can be granted.

Accordingly, it is **ORDERED** that the Macomb County defendants' motion to dismiss Count II of the Amended Complaint (ECF No. 15) is **GRANTED**.

It is further **ORDERED** that the Correct Care Solutions defendants' amended motion to dismiss (ECF No. 32) is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that Count II of the amended complaint is **DISMISSED**.  The motions are **DENIED** in all other respects.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Date:  June 29, 2020

-24-