UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CAROL HERRIGES, as
Personal Representative of
the ESTATE OF DIETER
HERRIGES-LOVE,
deceased.

Civil Action No.: 19-12193
Honorable David M. Lawson
Magistrate Judge Elizabeth A. Stafford

               Plaintiff,

v.

COUNTY OF MACOMB, *et
al.*,

               Defendants.

_____/

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION
TO COMPEL MORBIDITY AND MORTALITY REVIEWS AND
ALLOWING PLAINTIFF TO APPLY FOR REIMBURSEMENT OF
REASONABLE EXPENSES [ECF NO. 52]**

## I.    Introduction and Background

In a June 2020 opinion and order addressing defendants' motions to

dismiss, the Honorable David M. Judge Lawson summarized the factual

underpinnings of this case:

> On July 26, 2017, Dieter Herriges-Love joined the grizzly ranks
> of Macomb County, Michigan jail inmates who took their own
> lives while under the less-than-watchful eye of their jailers.  In
> the previous sixteen years, twenty-one souls preceded him.
> His estate has sued the County and medical providers for
> violating his federal constitutional rights.

[ECF No. 69, PageID.1101].

Carol Herriges, the plaintiff and Herriges-Love's personal representative, filed a complaint against Macomb County, Correct Care Solutions (CCS) and some individuals in July 2019, and she filed an amended complaint in October 2019.  [ECF No. 1; ECF No. 23]. Defendants filed two motions to dismiss, but neither motion disputed that plaintiff had sufficiently pleaded a claim of cruel and unusual punishment in violation of the Eighth Amendment.  [ECF No. 69, PageID.1109-1111]. CCS's motion requested dismissal of counts alleging that it had an unlawful custom of laxity and had used inadequate suicide precautions.  [*Id.*, PageID.1113-1121].  Judge Lawson rejected those challenges to the complaint, reasoning that "the plaintiff sufficiently has pleaded a *Monell*[1] claim alleging a policy, custom, and practice of deliberate indifference to the psychological needs of suicide-prone inmates."  [*Id.*, PageID.1115-1116].

To support its allegations about CCS's policy, custom and practice of deliberate indifference, plaintiff requested that CCS produce "Morbidity Mortality Reviews of any and all inmates who committed suicide from 2010

---

[1] Referring to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).

2

to the present." [ECF No. 52, PageID.728-729; ECF No. 52-2, PageID.752-753]. CCS objected that "all or some of the requested documents in its custody are patient safety work product protected from disclosure in litigation by federal law," and that the medical records of non-parties are not relevant and are protected by the Health Insurance Portability and Accountability Act (HIPAA), 42 U.S.C. § 1320d *et seq.* [ECF No. 52-2, PageID.753].

Plaintiff thus moved to compel the morbidity and mortality reviews. [ECF No. 52].[2] As described below, CCS's morbidity and mortality review documents include a "death report suicide" and "report of psychological autopsy." Consistent with other opinions, the Court will refer to those documents collectively as a "Report."

In response to plaintiffs' motion to compel, CCS dropped its HIPAA argument, but contended that the requested Reports are privileged under the Patient and Quality Improvement Act of 2005 (PSQIA). [ECF No. 56]. For the reasons below, the Court finds that CCS has not sustained its burden of showing that the Reports at issue are privileged under the PSQIA and thus grants plaintiff's motion to compel.

---

[2] Judge Lawson referred the motion to the undersigned for hearing and determination under 28 U.S.C. § 636(b)(1)(A). [ECF No. 54].

3

## II.    Analysis

### A.

The Court begins by addressing the argument that CCS made in response to plaintiff's motion to compel about the Report related to Vanessa Sexton, who committed suicide in February 2015.  CCS acknowledged in its response that Sexton died before it became compliant with the PSQIA.  [ECF No. 56, PageID.880].  Thus, CCS did not allege that Sexton's Report is privileged, but it still objected to producing it.  CCS states that her Report is not relevant, and that producing it would be more prejudicial than probative under Federal Rule of Evidence 403.  [*Id.*, PageID.894-895].  CCS reasoned that a jury reviewed Sexton's suicide in a medical malpractice action and "found that CCS was not liable and that CCS policies complied with the standard of care."  [*Id.*, PageID.895].  CCS's argument lacks merit.

At trial, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice."  Rule 403.  But information "need not be admissible in evidence to be discoverable."  Fed. R. Civ. P. 26(b)(1).  Under Rule 26(b)(1), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."

4

The requesting party has an "extremely low bar" for showing relevance.  *In re Ford Motor Co. Spark Plug & 3-Valve Engine Prod. Liab. Litig.*, 98 F. Supp. 3d 919, 925 (N.D. Ohio 2014) (noting Fed. R. Civ. P. 401 considers evidence relevant if it has "*any* tendency to make a fact more or less probable") (emphasis supplied in *In re Ford*).

Plaintiff easily clears the low bar of relevancy; the Reports of other inmates who committed suicide, including Sexton, are relevant to plaintiff's "*Monell* claim alleging a policy, custom, and practice of deliberate indifference to the psychological needs of suicide-prone inmates."  [ECF No. 69, PageID.1115-1116].  CCS makes no argument under the proportionality factors.  The Court thus rejects CCS's argument that Sexton's Report is not discoverable.

**B.**

The Court now turns to CCS's privilege argument.  CCS bears the burden of showing that the Reports at issue are privileged.  *In re Grand Jury Investigation No. 83-2-35*, 723 F.2d 447, 450 (6th Cir. 1983) ("The burden of establishing the existence of the privilege rests with the person asserting it.").

Under the PSQIA, "patient safety work product" is privileged, and not subject to discovery in court or administrative proceedings.  42 U.S.C. § 299b-22.  "Patient safety work product" (PSWP) is defined as

> any data, reports, records, memoranda, analyses (such as root cause analyses), or written or oral statements—
> (i) which—
>      (I) are assembled or developed by a provider for reporting to a patient safety organization and are reported to a patient safety organization; or
>      (II) are developed by a patient safety organization for the conduct of patient safety activities;
>           and which could result in improved patient safety, health care quality, or health care outcomes; or
> (ii) which identify or constitute the deliberations or analysis of, or identify the fact of reporting pursuant to, a patient safety evaluation system.

42 U.S.C. § 299b-21(7)(A).  A "patient safety evaluation system" (PSES) is "the collection, management, or analysis of information for reporting to or by a patient safety organization." § 299b–21(6).  Information that is "collected, maintained, or developed separately, or exists separately, from a patient safety evaluation system" is not patient safety work product. § 299b-21(7)(B)(ii).  A patient safety organization (PSO) is defined as "a private or public entity or component thereof that is listed by the Secretary" of Health and Human Services.  § 299b–21(4); 42 U.S.C. § 299b-24(d).

Congress enacted PSQIA "to limit the medical malpractice exposure of healthcare providers who collect and report patient safety information to

6

a PSO as part of a PSES." *Tinal v. Norton Healthcare, Inc.*, No. 3:11-CV-596-S, 2014 WL 12581760, at *5 (W.D. Ky. July 15, 2014). But the PSQIA created no "limitation or exception for federal civil rights or employment discrimination cases. To the contrary, the statute speaks in plain, unequivocal terms that encompass all federal, state or local civil or criminal proceedings." *Id.* at *9. The Court agrees with *Tinal* and finds that the PSQIA is applicable in § 1983 actions.

That said, the PSQIA does not broadly protect any healthcare provider work product. "While the PSQIA announces broad evidentiary protections for patient safety work product, its drafters made clear that the statue was not intended to provide a blanket protection for all information and communications generated for quality control purposes." *Johnson v. Cook Cty.*, No. 15 C 741, 2015 WL 5144365, at *6 (N.D. Ill. Aug. 31, 2015) (citing S.Rep. No. 108–196, at 2 (2003)). Courts have thus found that a provider seeking to protect work product from disclosure under the PSQIA must show that (1) "the withheld documents contain patient safety information gathered as part of a PSES"; and (2) the withheld documents were "reported by the provider to its PSO without being previously removed from the PSES or otherwise disclosed apart from the PSES." *Tinal*, 2014 WL 12581760 at 11; *see also Penman v. Correct Care Sols., LLC,* No.

7

518CV00058TBRLLK, 2020 WL 4253214, at *3 (W.D. Ky. July 24, 2020)

("Under the PSQIA, patient safety work product is entitled to confidentiality

and is privileged if it is [1] created for the purpose of reporting to a patient

safety organization ('PSO') and [2] is so reported.")

In *Penmen*, the court found that CCS had failed to make the

necessary showing.  2020 WL 4253214 at *4.  CCS submitted a declaration

that "broadly state[d] that 'Mortality & Morbidity Report and Reviews are

assembled and developed for reporting to the Center for Patient Safety, a

Patient Safety Organization.'" *Id*.  The CCS manager who signed the

declaration did "not state that this specific report was assembled and

developed for reporting to a PSO and, more importantly, she [did] not state

that the Report was assembled and developed for the sole purpose of

reporting to a PSO."  *Id*.  The evidence in fact suggested that the report at

issue had been produced by the Kentucky Department of Corrections

(KDOC).  *Id*.

> At the very least, KDOC's possession of the Report raises
> questions as to the Report's purpose(s) and whether it was
> created, at least in part, for reporting to KDOC. If it was created
> for reporting to KDOC, the Report would have been prepared
> for purposes other than reporting to a PSO and would not be
> PSWP. 81 Fed. Reg. 32655, 32656 (May 24, 2016). Later
> reporting such a document to a PSO does not then make that
> information PSWP. 42 U.S.C.A. § 299b-21(7)(B)(ii).

*Id*.

In *Johnson,* the court held that the Report at issue was not privileged because the defendant had "not met its burden of establishing the Report was reported to a PSO as required by the statute."  2015 WL 5144365 at *6.  Because the Report was not reported to a PSO, it did not meet the definition of patient safety work product, and thus was not afforded the "broad evidentiary protections" of the PSQIA.  *Id.* at *5-*6.

### C.

In its response brief, CCS notes that its contractual relationship with Macomb County began on October 1, 2011.  [ECF No. 56, PageID.879].  As a result, though plaintiff initially requested that CCS produce documents about inmates who committed suicide beginning in 2010, she now requests Reports related to suicides from October 1, 2011 to the present.  [ECF No. 70, PageID.1136].

Affiant Dawn Ducote said that, on May 26, 2016, CCS began submitting its Reports "to the Center for Patient Safety, a federally recognized PSO."  [ECF No. 56-3].  (The Center Patient Safety is referred to as "the PSO" in this opinion.)  CCS's response brief identified four inmates who committed suicide after it became compliant with PSQIA: Herriges-Love (July 26, 2017), Alfred Paige (August 30, 2018), Kalieb Solomon (September 13, 2019) and Steven Long (October 20, 2019).

[ECF No. 56, PageID.880].  But Ducote's affidavit was dated September

2018, before the two 2019 suicides CCS referred to in its responsive brief.

[*Id.*; ECF No. 56-3].  Ducote therefore could not have had had "personal

knowledge that all applicable CCS events, including mortalities, produced

since March 26, 2016," had been submitted to the PSO, as she alleged.

[ECF No. 56-3].  [*Id.*].

Plaintiff thus argued in her reply brief that Ducote's affidavit was not

proof that CCS submitted the Reports to the PSO, as required for data to

be privileged under the PSQIA.  [ECF No. 58, PageID.994].  Plaintiff also

questioned whether CCS had identified all inmates who committed suicide

since March 2016, noting that a news article said that Herriges-Love was

one of three inmates who committed suicide within a three-month period in

2017.  [ECF No. 58-7].  The article said that a woman had committed

suicide on May 6, 2017 and another man took his life on July 22, 2017.

[ECF No. 58-7].  CCS's response had identified only Herriges-Love's

suicide for the year 2017.  [ECF No. 56, PageID.880].

The Court agreed with plaintiff that CCS's response was inadequate

and thus scheduled an evidentiary hearing, which took place in June 2020.

Before the hearing, CCS submitted the affidavit of Grady Judson Bazzel,

M.D.,[3] supported by eight exhibits. Dr. Bazzel's affidavit says he is the

patient safety officer for CCS/Wellpath.  [Bazzel affidavit, ¶ 3].  He claims

that the information contained in his affidavit is based on his personal

knowledge "and the corporate processes put in place to implement the

patient safety program throughout the company."  [Bazzel affidavit, ¶ 5].

Dr. Bazzel's affidavit and testimony raised several red flags about his and

CCS's credibility, and CCS has not sustained its burden of showing that the

Reports at issues are privileged under the PSQIA.  The Court's reasoning

is detailed below.

*1.*

Dr. Bazzel wrote that a total of eight inmates committed suicide after

the beginning of CCS's contract with Macomb County.  [Bazzel affidavit at

¶ 15].  As noted, CCS's response had stated that only five inmates

committed suicide during that period, and it had excluded the two inmates

other than Herriges-Love who committed suicide in 2017.  [ECF No. 56*,*

PageID.880].  The fact that CCS's responsive brief failed to include three

relevant suicides undermines its credibility.

---

[3] This affidavit is attached to this opinion.

*2.*

Dr. Bazzel swore in his affidavit that a "Death Report Suicide" and a "Report of Psychological Autopsy" for each of the eight inmates who had committed suicide since September 2011, except potentially "T.C.," had been transmitted to the PSO in compliance with the PSQIA.  [Bazzel affidavit, ¶¶ 6-7, 15-16].  The affidavit suggested that Sexton's records may have been submitted to the PSO under the PSQIA, though Dr. Bazzel was "not certain."  [Bazzel affidavit, ¶ 23].  The suggestion that Sexton's suicide may have been reported to the PSO was new; CCS's response brief stated that Sexton's suicide happened *before* the May 2016 date in which it "joined and became compliant with the PSQIA," and that her data fell "outside of the protected area."  [ECF No. 56, PageID.894].  At the hearing, Dr. Bazzel changed his testimony; he confirmed that her Report had not been reported to the PSO.  [ECF No. 74, PageID.1181].  The Court finds that Dr. Bazzel's shifting testimony about Sexton's Report undermines his credibility.

Though Dr. Bazzel acknowledged at the hearing that Sexton's Report was not reported to the PSO, he testified that CCS has information about Sexton "with respect to some kind of morbidity/mortality review or some kind of analysis."  [*Id.*, PageID.1181-1182].  CCS thus appears to have

12

suggested that Reports that do not qualify as patient safety work product could still be privileged under the PSQIA.  [*Id.*].  That suggestion is flat wrong.  As noted, the PSQIA does not protect information that is collected outside of a patient safety evaluation system. § 299b–21(7)(B); *Penman*, 2020 WL 4253214 at *4; *Johnson*, 2015 WL 5144365 at *6.

*3.*

Dr. Bazzel and CCS have made conflicting assertions about J.C.'s Report.  CCS's response brief failed to identify J.C.  [ECF No. 56].  But Dr. Bazzel's affidavit says that J.C. committed suicide in September 2012, before CCS began submitting its data to the PSO under the PSQIA. [Bazzel Affidavit, ¶ 15].  Dr. Bazzel nonetheless stated in his affidavit that J.C.'s Report had been submitted to the PSO.  [Bazzel Affidavit, ¶ 16].  He changed his testimony at the hearing, agreeing that J.C.'s suicide would not have been reported to the PSO.  [ECF No. 74, PageID.1181].

Yet in CCS's post-hearing brief, CCS said that it had presented evidence that each Report for the relevant inmates, "with T.C. and Sexton aside," was "assembled or developed for reporting to PSO and was in fact reported to the PSO."  [ECF No. 72, PageID.1154-1155].  In other words, CCS asserted that J.C.'s Report was among those that were assembled for submission and actually submitted to the PSO.  [*Id.*].

13

Since J.C.'s suicide was almost four years before CCS alleges that it became compliant with the PSQIA, there is no possibility that J.C.'s Report was assembled for submission to the PSO.  Dr. Bazzel's and CCS's assertions otherwise contribute to this Court's doubt about their credibility.

Dr. Bazzel acknowledged that CCS possesses a Report about J.C. [*Id.*, PageID.1181-1182].  But CCS suggested at the hearing that J.C.'s Report should be protected under the PSQIA even though it was not prepared for or submitted to a PSO.  [*Id.*].  This suggestion is plainly wrong. § 299b–21(7)(B); *Penman*, 2020 WL 4253214 at *4; *Johnson*, 2015 WL 5144365 at *6.

*4.*

Dr. Bazzel said in his affidavit and confirmed at the hearing that T.C.'s Report could not be located.  [*Id.*, PageID.1209; Bazzel affidavit, ¶ 15].  That does not mean that T.C.'s Report no longer exists; Dr. Bazzel testified that CCS's failure to locate T.C.'s Report "doesn't mean that there aren't documents."  [ECF No. 74, PageID.1182].

As noted, T.C. committed suicide less than a week before Herriges-Love took his life in July 2017, and another inmate had committed suicide in May 2017.  [Bazzel affidavit, ¶ 15].  Given this string of suicides, CCS's inability to account for T.C.'s records raises a question about the

14

seriousness with which CCS treats Reports it alleges were created as part of a patient safety evaluation system.

*5.*

Dr. Bazzel's affidavit says that "Solomon Long" committed suicide on October 19, 2019, while CCS's response brief says that "Steven Long" died on October 20, 2019.  [*Id.*, PageID.880; Bazzel affidavit, ¶ 15].  Dr. Bazzel's affidavit thus identifies a different name and date of death than in CCS's brief.  During the hearing, Dr. Bazzel said that he "did the search for Solomon Long," but when plaintiff's counsel asked Dr. Bazzel if he would be surprised "that Solomon Long was never incarcerated in the Macomb County Jail," Dr. Bazzel said he may have made an error.  [ECF No. 74, PageID.1195].  The Court would have considered this error and the date discrepancy to be minor if they had been isolated, but the abundance of errors and discrepancies here are troubling and undermine Dr. Bazzel's and CCS's credibility.

*6.*

Exhibits D to H of Dr. Bazzel's affidavit purport to show that the Reports for Cathy Ajami-Moore, Herriges-Love, Kabieb Solomon, Steven

15

Long[4] and Alfred Page were all submitted to the PSO between October 18, 2019 and December 20, 2019.  The exhibits are screenshots of a computer file folder, with the relevant information being shown here:

Exhibit D:



Exhibit E:

Exhibit F:

---

[4] As noted, Dr. Bazzel's affidavit incorrectly identifies the inmate who died in October 2019 as "Solomon" Long.

Exhibit G:



Solomon Long - 10/19/2019

Exhibit H:

Alfred Paige - 8/23/2018

Thus, Reports for five inmates who committed suicide as early as July 2017 and as recent as October 2019 were all allegedly reported to the PSO within a two-month period from October to December 2019.  That is true even though the exhibits show that Herriges-Love's Report was last modified in August 2017, Ajami-Moore's Report was last modified in August 2018, and Paige's Report was last modified in October 2018.

Why did CCS wait more than two years to submit Herriges-Love's Report after it was completed, and more than a year to submit the Reports for Ajami-Moore and Paige after they were completed, while the other two Reports were submitted soon after the inmates committed suicide?  CCS

17

did not explain, but plaintiff notes that CCS's timing in submitting the Reports coincided with this litigation.  Plaintiff filed her complaint in July 2019 and served CCS with its request for production of documents on November 14, 2019.  [ECF No. 1; ECF No. 58-9].  As plaintiff's counsel noted during his questioning at the hearing, he served CCS with the request for the Reports *before* CCS alleges that submitted the Reports about Herriges-Love, Ajami-Moore, Long and Paige to the PSO.  [ECF No. 74, PageID.1194-1195].  CCS still had not submitted the Reports for Ajami-Moore or Paige when it responded to plaintiff's request for mortality documents on December 11, 2019 and artfully said that "*all or some* of the requested documents in its custody are patient safety work product" protected by the PSQIA.  [ECF No. 52-2, PageID.753 (emphasis added)].

Had CCS shared with Macomb County information from its Reports of Herriges-Love, Ajami-Moore and Paige when they were completed in 2017 and 2018, before they were allegedly reported the PSO late 2019?  CCS has not said.  If CCS did provide the information in those Reports to Macomb County before submitting it to the PSO, the Reports are excluded from the definition of patient safety work product and not privileged under PSQIA.  *Penman*, 2020 WL 4253214 at *4.

18

If CCS also had not shared the information in the Reports with Macomb County when they were completed in 2017 and 2018, then the Court must question CCS's commitment to preventing more inmates from joining the "grizzly ranks" of those who have taken "their own lives while under the less-than-watchful eye of their jailers."   [ECF No. 69, PageID.1101].  CCS's commitment to preventing more suicides is not a factor for determining if the Reports at issue are privileged under the PSQIA.  But the evidence that CCS so delayed submitting the Reports to the PSO weakens its post-hearing plea that compelling it to disclose the Reports would undermine its efforts to "discuss how to improve the culture of safety."  [ECF No. 72, PageID.1163].

The evidence suggests that CCS has been too slow to advance those discussions, and that it was too slow even after Judge Bernice Donald observed three years before Herriges-Love died that suicides were occurring "at an alarming rate" in Macomb County. *Grabow v. Cty. of Macomb*, 580 F. App'x 300, 314 (6th Cir. 2014) (concurrence).

*7.*

Exhibits A to C of Dr. Bazzel's affidavit is an Excel document that includes instructions for submitting data to the PSO electronically.  The instructions say that the "[f]ile must be in an Excel or .csv format" and it

must be sent "via encrypted email to CPS PSO data center."  CCS

presents no receipts for the emails it allegedly sent to the PSO to submit

the Reports.  Instead, CCS's alleged proof of submission to the PSO is

Exhibits D to H—the computer screenshots excerpted above showing

documents that were stored in PDF or Word format.

When asked about the fact that the documents showing in Exhibits D

to H were in formats that did not comply with the instructions for electronic

submission to the PSO, Dr. Bazzel testified, "As far as the actual process

that goes on when our administrative assistant reports the data to the PSO,

I couldn't speak to the details of that."  [ECF No. 74, PageID.1200-1202].

Dr. Bazzel's administrative staff submitted the records to the PSO; he did

not.  [*Id.*, PageID.1206].  Dr. Bazzel had "no personal knowledge that these

records were actually submitted to the Center for Patient Safety" and was

relying on his staff to do what they were supposed to do.  [*Id.*,

PageID.1211-1212].  The Court notes that, during direct examination, Dr.

Bazzel testified about the process for reporting described in Exhibits A to C,

and only admitted on cross-examination that he had no personal

knowledge of the process.  [*Id.*, PageID.1178-1180].

Dr. Bazzel's lack of personal knowledge renders his testimony

inadequate for sustaining CCS's burden of showing that the Reports were

20

submitted to the PSO.  "A witness may testify to a matter only if evidence is

introduced sufficient to support a finding that the witness has personal

knowledge of the matter."  Fed. R. Evid. 602.  It is true that "[p]ersonal

knowledge can come from review of the contents of business records, and

an affiant may testify to acts that she did not personally observe but which

are described in business records."  *Odom Indus., Inc. v. Diversified Metal*

*Prod., Inc.*, No. 1:12-CV-309, 2012 WL 4364299, at *8 (S.D. Ohio Sept. 24,

2012) (citation and quotation marks omitted).  In *Odum Indus.*, the chief

compliance officer had enough personal knowledge to testify about

business records because he had reviewed the business records and was

"familiar with Odom's method and procedures for generating, storing and

organizing the records and documents generated at all times relevant to

this lawsuit."  *Id.*

Here, Dr. Bazzel testified that he was not familiar with the process for

reporting data to the PSO.  [ECF No. 74, PageID.1200-1202, 1206].  He

also did not testify that he had reviewed business records showing that the

Reports were submitted to the PSO; he simply relied on "his staff to do

what they were supposed to do."  [*Id.*, PageID.1211-1212].  Since Dr.

Bazzel lacked personal knowledge that the Reports were reported to the

PSO, CCS cannot sustain its burden of showing that the Reports are

privileged under the PSQIA.  *Penman*, 2020 WL 4253214 at *4; *Tinal*, 2014 WL 12581760 at 11.

*8.*

Dr. Bazzel lacks other critical personal knowledge.  His affidavit refers to the entity he works for as CCS/WellPath.  That is because, in 2018, CCS joined with another company (CMGC) to form a new company called WellPath.  [ECF No. 74, PageID.1197, 1205, 1210].  WellPath was the entity that allegedly submitted the Reports at issue to the PSO in 2019, but plaintiff notes that the PSO does not identify WellPath as one of its providers.  [*See* ECF No. 58-3 (dated 3/4/2020)].  During the hearing, Dr. Bazzel testified that he did not know "what steps, if any," WellPath took to become a reporting provider to the PSO and did not know why WellPath was not listed as a provider.  [ECF No. 74, PageID.1197-1198, 1202, 1205-1206].

On redirect, Dr. Bazzel agreed that "all of these records were submitted to the PSO pursuant to an agreement that [he'd] believe was in place."  [*Id.*, PageID.1210].  But Dr. Bazzel's mere belief is not proof because he disclaimed any knowledge of whether WellPath had taken steps to become provider for the PSO and did not know why it was not listed as one.  CCS's counsel suggested that WellPath maintained CCS's

22

provider status with the PSO after WellPath was formed, but Dr. Bazzel had no knowledge to support that suggestion.  [ECF No. 74, PageID.1210].

The Court notes that plaintiff included the print-out showing that WellPath was not listed as a provider of the PSO in her March 2020 reply brief.  [ECF No. 58-3].  CCS could have adduced evidence during the June 2020 hearing to address the question of WellPath's relationship with the PSO.  CCS's failure to produce evidence showing that WellPath was a provider within the meaning of § 299b-21(7)(A)(i) when it allegedly submitted the Reports to the PSO is critical to its claim of privilege.

***

In sum, CCS has failed to sustain its burden of showing that the Reports of the Macomb County inmates who committed suicide from September 2012 to October 2019 are privileged under the PSQIA.  [*See* Bazzel affidavit at ¶ 15].  There is no genuine factual dispute about the Reports related to J.C. and Sexton, and CCS has failed to sustain its burden of showing that the Reports for the other six inmates constitutes patient safety work product under § 299b-21(7)(A).

The Court cannot order CCS to produce documents that it no longer possesses or that do not exist.  *Roden v. Floyd*, No. 2:16-CV-11208, 2019 WL 1098918, at *3 (E.D. Mich. Mar. 8, 2019).  But CCS must support any

23

claim that documents cannot be located or no longer exist with an affidavit from someone with personal knowledge explaining the steps that person took to find the documents, and describing any known reason why the documents cannot be located or no longer exist.

### D.

Since plaintiff's motion to compel is being granted, Federal Rule of Civil Procedure 37(a)(5) requires the Court to, "after giving an opportunity to be heard," order CCS to pay plaintiff's "reasonable expenses incurred in making the motion, including attorney's fees," unless (i) plaintiff "filed the motion before attempting in good faith to obtain the disclosure or discovery without court action"; (ii) CCS's "nondisclosure, response, or objection was substantially justified"; or "(iii) other circumstances make an award of expenses unjust."

As such, plaintiff may apply for an order requiring CCS to reimburse her reasonable expenses.  Her application must include a bill of costs and analysis of Rule 37(a)(A)(i)-(iii).  CCS may respond.

### III.    Conclusion

The Court **GRANTS** plaintiff's motion to compel **[ECF No. 52]**, and **ORDERS** CCS to produce, for inmates who committed suicide since October 1, 2011 to the present, all Reports (including any document that is

part of a "morbidity and mortality review," "death report suicide" or "report of psychological autopsy") for each such inmate, by **AUGUST 28, 2020**.  Any affidavit stating that CCS cannot locate a Report or that a Report no longer exists must also be produced by **AUGUST 28, 2020**.

Plaintiff may apply for an order requiring CCS to reimburse her reasonable expenses by **AUGUST 28, 2020.**  CCS may respond by **SEPTEMBER 11, 2020**.

s/Elizabeth A. Stafford
ELIZABETH A. STAFFORD
United States Magistrate Judge

Dated: August 14, 2020

## <u>NOTICE TO PARTIES ABOUT OBJECTIONS</u>

Within 14 days of being served with this order, any party may file objections with the assigned district judge.  Fed. R. Civ. P. 72(a).  The district judge may sustain an objection only if the order is clearly erroneous or contrary to law.  28 U.S.C. § 636.  **"When an objection is filed to a magistrate judge's ruling on a non-dispositive motion, the ruling remains in full force and effect unless and until it is stayed by the magistrate judge or a district judge."**  E.D. Mich. LR 72.2.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 14, 2020.

s/Marlena Williams
MARLENA WILLIAMS
Case Manager