# EXHIBIT 71

*CAROL HERRIGES, as Personal Representative of the ESTATE OF DIETER HERRIGES-LOVE, Deceased, Plaintiff,*
*v.*
*COUNTY OF MACOMB; AARON HORNE; GARY BABICH; CORRECT CARE SOLUTIONS, LLC; DR. LAWRENCE SHERMAN; JAMIE KNEISLER, RN,*
*Jointly and Severally,, Defendants,*
*in the*
*UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF MICHIGAN*
*SOUTHERN DIVISION*
*CIVIL ACTION NO. 19-cv-12193*

# EXPERT REPORT

## I. INTRODUCTION

This is an expert report addressing the issues related to the care and custody of Mr. Dieter Herriges-Love while in the custody of the Macomb County Jail on July 26, 2017. This report is predicated upon the information outlined in the section "Materials Reviewed." Should additional information be disclosed that affects my opinions and conclusions, I reserve the right to alter my opinions and conclusions as necessary.

## II. QUALIFICATIONS

I have been employed in the criminal justice system since 1984 when I began work with the Fayette County Detention Center in Lexington, Kentucky, as a Deputy Jailer. In 1985 I was assigned as Training Coordinator for the Fayette County Detention Center and began the development of a formal Pre-service and In-service Deputy Jailer training program for the jail. An area of additional assignment was the development, revision and maintenance of the Detention Center's policies and procedures. I remained in this position until 1992 when I assumed the position of Planning and Research Analyst at the Detention Center to develop and implement an objective jail classification system. This implementation included the development of a management information system infrastructure and programming to accomplish the goals of the jail classification system. I attained the position of Administrative Deputy, Senior (Deputy Director) for the Division of Detention in 1996 assuming increased levels of administrative responsibility that included a primary role in the planning, design and construction of a 1000+ Direct Supervision detention facility, combining the principles of Objective Jail Classification with Direct Supervision. Throughout my tenure I continued to perform the functions of a Deputy Jailer often wearing two, or more hats. Performing those essential job functions varied and diminished in frequency as the supervisory responsibilities within the agency increased.

In 2001, I was assigned the additional responsibility of contract development and management for privatized services (food, medical, mental health, commissary, inmate telephones) and various other projects. In 2004, I was assigned the development and supervision of the Lexington-Fayette Urban County Division of Community Corrections Bureau of Professional Standards which included Internal Affairs; Safety, Sanitation and Standards; and Administrative and Disciplinary Hearings. I retired from my last position in August 2008.

My consulting activities began in the early 1990's. I have been a certified instructor of correctional curriculum since 1985, and have been a FBI certified firearms instructor and a Federal Bureau of Prisons defensive tactics instructor. I have taught and consulted for the National Institute of Corrections since 1990, the American Jail Association since 2004, and other criminal justice system consulting agencies. I have assisted in developing policies and procedures for jails throughout the country. I have conducted numerous classification system evaluations of mega-jails, large jails, medium jails and small jails in various states around the US for the National Institute of Corrections and other contractors. I am experienced in matters involving overall jail management including, but not limited to,

such areas as the use of force; issues of security and operations; the provision of medical and mental health services; classification and inmate behavior management; contract management for privatized services (food, medical, mental health); management information systems; strip search; gang and security threat group management in jails. I have co-created and developed a new jail management paradigm – Mission Based Management. I received a Bachelor of General Studies in Social and Political Theory and a Doctorate in Public Administration. I have been a member of the Board of Directors for the American Jail Association and serve as Second Vice-President on the Executive Board. I am also on the faculty of the Americans for Effective Law Enforcement (AELE), where I instruct at seminars on topics of Inmate Classification, in-custody death prevention, Prison Rape Elimination Act and serve on the Editorial Board for AELE's publications.

In recent years, I have become involved in litigation consultation and expert witness work for both the plaintiff and the defense. These cases primarily involved strip search, classification, use of force, medical care, in-custody deaths and conditions of confinement. My opinions are given within a reasonable degree of professional certainty in those areas involving jail and correctional issues, acceptable correctional practice, correctional administration and correctional supervision.

## III. PUBLICATIONS

1. "A New Strip Search Paradigm," Leach, Donald and Sabbatine, Ray, American Jails, Hagerstown: November/December 1996
2. "Journey into Objective Jail Classification," Leach, Don and Sabbatine, Ray, American Jails, Hagerstown: January 1999
3. "Mission Creep and the Role of the Jail in Public Health Policy," LJN Exchange, National Institute of Corrections, US Department of Justice, 2004
4. "Creating a New Jail Management Paradigm," Zimny-Western University, Published Dissertation, 2004
5. "Are Tasers in Jails a Great New Tool or Another Headache," LJN Exchange, National Institute of Corrections, US Department of Justice, 2006
6. "Issues Surrounding Managing Lesbian, Gay, Bi-sexual, Transsexual, and Intersex Offenders (LGBTI) in Jails," LJN Exchange, National Institute of Corrections, US Department of Justice, 2006
7. "Excited Delirium: Fact or Fiction," LJN Exchange, National Institute of Corrections, US Department of Justice, 2007
8. "Issues Surrounding Managing Lesbian, Gay, Bi-sexual, Transsexual, and Intersex Offenders (LGBTI) in Jails," Corrections Professional, November 2007
9. "Issues Surrounding Managing Lesbian, Gay, Bi-sexual, Transsexual, and Intersex Offenders (LGBTI) in Jails," American Jails, Hagerstown: November/December 2007
10. "Carrots versus Sticks: Managing Behavior in the Jail," Correctional Managers Report, April/May 2008
11. "PREA Draft Standards are PREA 'DAFT'" Standards," Correctional Managers Report, August 2008
12. "Carrots versus Sticks: Managing Behavior in the Jail," American Jails, Hagerstown: November/December 2008
13. "Prison Rape Elimination Act Lives On," Correctional Managers Report, December/January 2009
14. "PREA Redux: What's It Going to Cost?" Correctional Law Reporter, December/January 2010
15. "PREA Redux: What's It Going to Cost Us?" American Jails, Hagerstown: May/June 2010
16. "Arrestee Strip Searches: An Administrator's View," Correctional Law Reporter, July/August 2010
17. "The Use of Force Continuum: Is it Worth Keeping? (Part 1)," Collins, William; Swartz, Jeffrey; and Leach, Donald, Correctional Law Reporter, December/January 2011
18. "The Use of Force Continuum: Is it Worth Keeping? (Part 1)," Collins, William; Swartz, Jeffrey; and Leach, Donald, Correctional Law Reporter, May/June 2011

## IV. COMPENSATION

My retainer is $5,000.00. The rate of compensation is $250.00 per hour for document and materials review, research, consultation. Expert report generation will be completed at the rate of $250 per hour which will be in addition to the minimum file review fee of $5,000. The fee for depositions is $2,500.00 for the first 5-hours and $400 per hour for any subsequent time (video depositions are $3500 for the first 5-hours and $400 per hour for any subsequent time) with a maximum of seven (7) hours of testimony per day. Trial testimony is $3,500.00 for each day or portion of a day testifying. Site visits or days waiting to testify, are billed at $1,000.00 per day plus all reasonable expenses (hotel, travel, rental vehicle, meals, printing and duplication). Fees for travel, deposition, awaiting trial and trial testimony requires payment in advance of event date.

## V. CASE HISTORY DISCLOSURE

Cases in which I have testified in court or deposition in the past four years:

1. *Pia Sacchetta v. Lake County Sheriff, Peyton C. Grinnell, et.al., Circuit Court of the Fifth Judicial Circuit, Lake County, Florida, 5:19-CV-00561-JSM-PRL (10/2020)*
2. *Amy Hill v. Okmulgee County Criminal Justice Authority, et al., U. S. District Court of Oklahoma, Eastern District, 18-394-SPS (05/2020)*
3. *Joshua Reece vs.Shelby County, Kentucky D/B/A Shelby County Detention Center, et al., U. S. District Court, Eastern District of Kentucky, Frankfort Division, 3:16-CV-69-GFVT (03/2020)*
4. *Euron Matthew v.Jake Debus, et al., U.S. District Court, Northern District of Illinois, Eastern Division, 1:14-CV-06003 (02/2020)*
5. *Kevin Younger v. Jemiah L. Green, U.S. District Court, District of Maryland, 24-C-17-0047S2 OC (01/2020)*
6. *Euron Matthew v.Jake Debus, et al., U.S. District Court, Northern District of Illinois, Eastern Division, 1:14-CV-06003 (01/2020)*
7. *Kevin Younger v. Jemiah L. Green, U.S. District Court, District of Maryland, 24-C-17-0047S2 OC (10/2019)*
8. *William Dillon, et al., v. Clackamas County and Craig Roberts, U.S. District Court, District of Oregon, 3:14-cv-820-YY (07/2019)*
9. *Kevin Younger v. State of Maryland, Circuit Court for Baltimore City, 24-C-17-0047S2 OC (06/2019)*
10. *Darcy Corbitt, Destiny Clark and John Doe v. Hal Taylor, Charles Ward, Deena Pregno and Jeanne Eastman, U. S. District Court, Middle District of Alabama, Northern Division, 2:18-cv-00091-MHT-GMB (12/2018)*
11. *Donald J. Hinson v. Sheriff Grady Judd; et al., U. S. District Court, Middle District of Florida, Tampa Division, 8:17-CV-02039-JDW-MAP (10/2018)*
12. *Solomon Cindea v. Matthew Abbott, et al., U. S. District Court, Northern District of Ohio, Eastern Division, 4:17-cv-02525 (09/2018)*
13. *Debra Hopkins v. Board of Wilson County, Kansas, Commissioners, et al., U.S. District Court, District of Kansas, 2:15-CV-2071-CM-GLR (08/2018)*
14. *Michelle Kindoll, v. Southern Health Partners, et al., U. S. District Court, Eastern District of Kentucky, Northern Division at Covington, 2:17-CV-84-DLB-JGW (07/2018)*
15. *Rachel M. Hammers v. Douglas County, et. al, U.S. District Court, District of Kansas, 2:15-CV-07994-CM-KGG (06/2018)*
16. *Steven C. Smith v. Travis Turner, et al., U. S. District Court, Southern District of Alabama, 1:15-CV-371-CG-C (02/2018)*
17. *James Barnes v. Sheriff John T. Boyd, LaPorte County Sheriff's Department, LaPorte County et al., U. S. District Court, Northern District of Indiana, 3:16-CV-00190-RLM-MGG (01/2018)*
18. *Robert Moore v. Mason County, Kentucky and Mason County, et al., U. S. District Court, Eastern District of Kentucky, 2:16-CV-00185-DLB-CJS ( 01/2018)*

19. *Randy S. Hisey, for James Merchant v. Woodbury County; et al., U. S. District Court, Northern District of Iowa, Western Division, 7C16-CV-4111 (11/2017)*

20. *Taylor Martin v. Miguel Huapilla, Dayton Gaston, Joseph Peaks and Michael Scott, U. S. District Court, Middle District of Florida, 2:16-cv-537-FTM-99MRM (08/2017)*

21. *Jose Luis Garza v. City of Donna, Texas, U.S. District Court, Southern District of Texas, McAllen Division, 7:16-CV-00558 (05/2017)*

22. *Anthony Waller v. Bradley Lovinger, U.S. District Court, District of Colorado, 14-CV-02109-WYD-NYW (05/2017)*

23. *Bradley Johansen v. Officer A.J. Cox and the City of Kent, U.S. District Court, Western District of Washington at Seattle, 216-CV-004160 (01/2017)*

24. *Rachel M. Hammers v. Douglas County, et. al, U.S. District Court, District of Kansas, 2:15-CV-07994-CM-KGG (08/2016)*

25. *Charles Axl Rose v. McCreary County, et al., U. S. District Court, Eastern District of Kentucky, 6:14-CV-00111-GFVT (03/2016)*

26. *Timothy Redmond, et. al. v. Scott Crowther, et. al., U. S. District Court, District of Utah, 2:13-cv-00393DAK (7/2015)*

27. *Jerome Odom v. Steve Whidden, Twentieth Judicial Circuit, Florida, Civil Division, Number 2012-570-CA (7/2015)*

28. *Christina Bobbin v. Corizon Health, Inc., f/k/a Prison Health Services, Inc., et. al., Mike Scott, et. al., U. S. District Court, Middle District of Florida, 2:14-cv-158-FtM-29DNF (07/2015)*

29. *Shana Bennett v. Hinds County, Mississippi, and John and Jane Does 1-100, U. S. District Court, Southern District of Mississippi, 3:14-CV-753-DNJ-FKB (02/2015) consolidated with Damion Lewis and Derrick Lewis v. Hinds County, Mississippi, John and Jane Does 1-100, U.S. District Court, Northern District of Mississippi, 3:14-cv-450-TSL-JM (02/2015)*

30. *Joseph Reilly v. Sheriff of Leon County, Florida, U. S. District Court, Northern District of Florida, 4:14-CV-00397-RH-CAS (01/2015)*

31. *FK.S., K.K., H.M., T.K., J.H., S.B., S.C., T.S., C.K., D.R., L.A., and M.L., v. City of Puyallup, Police Chief Bryan Jeter, Lieutenant Edward Shannon, U. S. District Court, Eastern District of Washington, 3:13CV-05926 (12/2014)*

32. *Oral Jason Murphy v. Clark County Sheriff's Office, Paul Gaudette, Tammy Webster, U. S. District Court, Eastern District of Missouri, 13-CV-1103 (11/2014)*

33. *Frank Hyman v. City of Philadelphia, Warden Clyde Gainey, Deputy Warden Gerald May, Lieutenant Demond Anderson, Corrections Officers Dwayne Corley and Ryan Hoover, U. S. District Court, Eastern District of Pennsylvania, 10-499 (05/2014)*

34. *Christina Smith v. Erie County Sheriff's Department; Erie County Board of Commissioners; Terry Lions; D. Todd Dempsey; Brittany M. Hausman; Sarah R.Worley; Jason A. Beatty; Kyle Bellamy; Linda Scroggy; and Perkins Township Board of Trustees, U. S. District Court, Northern District of Ohio, 3:12-CV-01853-DAK (09/2013)*

## VI. MATERIALS REVIEWED

I reviewed the following materials in formulating my opinion in this case.

1. "Administrative Rules for Jails and Lockups," County Jail Services Unit, Michigan Department of Corrections filed 07/28/1998
2. Classification File
3. Deposition and Exhibits
   - 3.1. Babich, Gary
     - 3.1.1. Dated 07/10/2020
     - 3.1.2. Dated 07/28/2020
   - 3.2. Gordon, Jeremy dated 09/02/2020
   - 3.3. Horne, Horne dated 06/03/2020
   - 3.4. Kraft, Phil dated 08/13/202
   - 3.5. Sanborn, Michelle dated 09/17/2020
4. Death Investigation, Number 8565-15 dated 02/06/2014 (Sexton, Vanessa Lynn)
5. Death Investigation, Number 35093-17 dated 05/06/2017 (Ajami-Moore, Cathy)
6. Death Investigation, Number 55451-17 dated 07/22/2017 (Coddington, Todd Michael)
7. Death Investigation, Number 56349-17 dated 07/26/2017 (Herriges-Love, Dieter Kendrick)
8. Death Investigation, Number 63112-18 dated 08/23/2018 (Paige, Alfred Kenneth)
9. Death Investigation, Number 77229-19 dated 09/13/2019 (Solomon, Kalieb Lamario)
10. Death Investigation, Number 87731-19 dated 10/19/2019 (Long, Steven Paul)
11. Death Investigation Summary, Office of Professional Standards, Number 2149-10 dated 01/08/2010 (Chowdhury, Mohammed Abul Fazal)
12. Death Investigation Summary, Office of Professional Standards dated 08/24/2010 (Drewek, Christopher Joseph)
13. Death Investigation Summary, Office of Professional Standards dated 08/24/2010
14. Death Investigation Summary, Office of Professional Standards dated 03/18/2011 (Trombley, Benjamin Michael)
15. Death Investigation Summary, Office of Professional Standards dated 04/24/2011 (Weathington, Joey Eric_
16. Death Investigation Summary, Office of Professional Standards dated 08/15/2011 (Prochnow, Kristina Marie)
17. Death Investigation Summary, Office of Professional Standards 09/08/2012 (Cook, James Vernon)
18. First Amended Complaint and Jury Demand filed 10/30/2019

19. Floor Plan Schematic- 10/11 (Exhibit 4)
20. Floor Sheet, Tower 11 dated 07/26/2017; 1430 hours
21. Inmate Guide (Handbook), Macomb County Jail
22. Inmate Witness Statements
    - 22.1. Allen, undated
    - 22.2. Attles, Ronald dated 07/26/2017
    - 22.3. Austin, Sylvester undated
    - 22.4. Barnes, James undated
    - 22.5. Beasley, Austin dated 07/26/2017
    - 22.6. Coleman, undated
    - 22.7. Collins, T'Quillo dated 07/26/2017
    - 22.8. Cooley, Dion dated 07/26/2017
    - 22.9. Crawley, Javeontae undated
    - 22.10. Gordon, Dean dated 07/26/2017
    - 22.11. Green, Richard undated
    - 22.12. Harris undated
    - 22.13. Herman undated
    - 22.14. Hightower, DeMario undated
    - 22.15. Krok, Andrew dated 07/26/2017
    - 22.16. Lofton, Quincy undated
    - 22.17. Lute, Jake undated
    - 22.18. Pacquette, Jerry undated
    - 22.19. Parish, Darrell undated undated
    - 22.20. Piasecri, Joseph dated 07/26/2017
    - 22.21. Selmani, Fadil undated
    - 22.22. Simmons, Daniel undated
    - 22.23. Tackett, Thomas dated 07/26/2017
    - 22.24. Thomas, Jamar dated 07/26/2017
    - 22.25. Wilson, Lamonte undated
    - 22.26. Wright, R. undated
23. Investigative Supplement Report, Incident Number 40093-01 dated 06/20/2001 (Tarzwell, Carl William)

24. Jail Incident Reports-Attempted Suicides

24.1. Case 2015-00019307 dated 03/28/2015; 1430 hours-Attempted Suicide

24.2. Case 2015-00021965 dated 04/09/2015; 1241 hours-Attempted Suicide

24.3. Case 2015-00030249 dated 05/15/2015; 1314 hours-Attempted Suicide

24.4. Case 2015-00047467 dated 07/25/2015; 1541 hours-Attempted Suicide

24.5. Case 2015-00055493 dated 08/26/2015; 1525 hours-Attempted Suicide

24.6. Case 2015-00060730 dated 09/15/2015; 1918 hours-Attempted Suicide

24.7. Case 2015-00071253 dated 10/28/2015; 1305 hours-Attempted Suicide

24.8. Case 2016-00003166 dated 01/13/2016; 2345 hours-Attempted Suicide

24.9. Case 2016-00030970 dated 04/14/2016; 2225 hours-Attempted Suicide

24.10. Case 2016-00044618 dated 05/31/2016; 2050 hours-Attempted Suicide

24.11. Case 2016-00050008 dated 06/19/2016; 1249 hours-Attempted Suicide

24.12. Case 2016-00056347 dated 07/07/2016; 2005 hours-Attempted Suicide

24.13. Case 2016-00066355 dated 08/12/2016; 1732 hours-Attempted Suicide

24.14. Case 2016-00069139 dated 08/22/2016; 2142 hours-Attempted Suicide

24.15. Case 2016-00073634 dated 09/06/2016; 2122 hours-Attempted Suicide

24.16. Case 2016-00077040 dated 09/18/2016; 0804 hours-Attempted Suicide

24.17. Case 2016-00083225 dated 10/09/2016; 1801 hours-Attempted Suicide

24.18. Case 2017-00003303 dated 01/13/2017; 0700 hours-Attempted Suicide

24.19. Case 2017-00006563 dated 01/24/2017; 1930 hours-Attempted Suicide

24.20. Case 2017-00010956 dated 02/09/2017; 1605 hours-Attempted Suicide

24.21. Case 2017-00026186 dated 04/03/2017; 2016 hours-Attempted Suicide

24.22. Case 2017-00028625 dated 04/11/2017; 2152 hours-Attempted Suicide

24.23. Case 2017-00029468 dated 04/14/2017; 2321 hours-Attempted Suicide

24.24. Case 2017-00030348 dated 04/18/2017; 0925 hours-Attempted Suicide

24.25. Case 2017-00034112 dated 05/03/2017; 0030 hours-Attempted Suicide

24.26. Case 2017-00035722 dated 05/08/2017; 1917 hours-Attempted Suicide

24.27. Case 2017-00042782 dated 06/04/2017; 1917 hours-Attempted Suicide

24.28. Case 2017-00061361 dated 08/15/2017; 1155 hours-Attempted Suicide

24.29. Case 2017-00065832 dated 08/31/2017; 2110 hours-Attempted Suicide

24.30. Case 2017-00069006 dated 09/12/2017; 1817 hours-Attempted Suicide

24.31. Case 2017-00069741 dated 09/14/2017; 2215 hours-Attempted Suicide

24.32. Case 2017-00074033 dated 09/30/2017; 1720 hours-Attempted Suicide

24.33. Case 2017-00077745 dated 10/15/2017; 1354 hours-Attempted Suicide

24.34. Case 2017-00081491 dated 10/29/2017; 1118 hours-Attempted Suicide

24.35. Case 2017-00088278 dated 11/24/2017; 1807 hours-Attempted Suicide

24.36. Case 2017-00089448 dated 11/29/2017; 1540 hours-Attempted Suicide

25. Jail Incident Report, Number 2017-00056349-Herriges-Love, Dieter dated 07/26/2017; 1150 hours

    25.1. Sobh, Abraham

26. Jail Incident Report Supplement-Number 2017-00056349-Herriges-Love, Dieter dated 07/26/2017

    26.1. Ajini, Mark

    26.2. Babich, Gary

    26.3. Collins, James

    26.4. Costanzo, Christopher

    26.5. Cracchiolo, Joseph

    26.6. Gerkey, Daniel

    26.7. Grant, Kevin

    26.8. Horne, Aaron

    26.9. Jones, Scott

    26.10. Licavoli, William

    26.11. Misch, Lori

    26.12. Mueller, Richard

    26.13. Muzzarelli, Andrew

    26.14. Pomaville, Ronald

    26.15. Rattray, Jefffrey

    26.16. Ruiz, Larry

    26.17. Shock, Mark

    26.18. Stanley, James

27. Jail Incident Report Supplement-Number 2017-00056349-Herriges-Love, Dieter dated 07/27/2017

    27.1. Gerkey, Daniel

    27.2. Schulte, Scott

28. Jail Incident Report Supplement-Number 2017-00056349-Herriges-Love, Dieter dated 08/0327/2017

28.1. McPherson, Jeffrey

29. Jail Records-Herriges-Love, Dieter

29.1. Commitment-Disposition of Arraignment

29.1.1. Dated 07/10/2017

29.1.2. Dated 07/19/2017

29.2. Event Information Form dated 07/13/2017

29.3. Inmate Classification Notice dated 10/25/2016

29.4. Inmate Classification Notice-Staff Copy

29.4.1. Dated 10/25/2016

29.4.2. Dated 07/13/2017

29.5. Inmate History: Classification dated 07/12/2017; 0813 hours

29.6. Inmate Profile Sheet

29.6.1. Dated 10/21/2016; 1546 hours

29.6.2. Dated 07/19/2017; 2001 hours

29.7. Inmate Property Receipt In/Out dated 07/11/2017; 0025 hours

29.8. Jail Detention Card dated 07/10/2017

29.9. NCIC dated 07/14/2017; 0034 hours

29.10. Jail Classification Checklist

29.10.1. Dated 10/25/2016

29.10.2. Dated 07/13/2017

29.11. Memo to Jail Command

29.11.1. Dated 10/21/2016

29.11.2. Dated 07/11/2017

29.11.3. Dated 07/16/2017

29.12. Offendertrak (OTMAIN) dated 07/26/2017; 1232 hours

29.13. Request for Segregation Agreement dated 10/22/2016

29.14. Prisoner Detention Information dated 10/21/2016

29.15. Lock-up Screening dated 10/20/2016; 1500 hours

29.16. Bond Receipt dated 10/29/2016; 1416 hours

29.17. Booking Disposition Card

29.17.1. Dated 10/21/2016; 1500 hours

29.17.2. Dated 10/29/2016; 1425 hours

29.18. Inmate Property Receipt In/Out

29.18.1. Dated 10/21/2016

29.18.2. Dated 10/29/2016

29.19. Jail Detention Card

30. KeyScan Connector v1.0.0 Tours, revised 06/10/2008 start dated 07/26/2017; 0732 hours, Tower 10/11

31. Legacy Narrative for Case Number 2015-00004110 dated 01/18/2015 (Cooney, Morgan)

32. Letter, "Re: MCJ Bed Replacement Project," from Anthony M. Wickersham to Mark F. Deldin dated 03/02/2018

33. Logbooks-Tower 10 start dated 07/26/2017; 0655 hours

34. Logbooks-Tower 11 start dated 07/26/2017; 0540 hours

35. Macomb County Board Meeting 3-14-18.mp4 (Board of Commissioners)

36. Macomb County Defendants' Answers and Objections to Plaintiff's First Request for Production of Documents to Defendant County of Macomb filed 01/07/2020

37. Macomb County Jail Initial Classification/Temporary Cell Assignment-Herriges-Love, Dieter

37.1. Dated 10/21/2016; 1445 hours

37.2. Dated 07/10/2017; 1622 hours

38. Medical Autopsy/ Toxicology-Ajami-Moore, Cathy dated 05/25/2017

39. Medical Records

39.1. Alcohol Withdrawal Chlordiazepoxide Administration Flowsheet dated 07/11/2017

39.2. Authorization to Act dated 07/11/2017

39.3. Chlordiazepoxide(Librium) Fact Sheet dated 07/11/2017

39.4. CIWA-AR Score Sheet Alcohol and Benzodiazepine Withdrawal dated 07/11/2017

39.5. Cows Score Sheet Opiate withdrawal Sheet

39.5.1. Dated 10/26/2016

39.5.2. Dated 10/19/2020

39.6. Emergency Response Worksheet dated 07/26/2017

39.7. Initial Mental Health Evaluation dated 10/25/2016

39.8. Macomb County Jail Initial Classification/Temporary Cell Assignment dated 07/10/2017; 1622 hours

39.9. Medical History and Physical Assessment with Mental Health dated 07/21/2017

39.10. Medication Order

39.10.1. Dated 10/21/2016

39.10.2. Dated 07/11/2017

39.11. Memo to Jail Command

39.11.1. Dated 10/21/2016

39.11.2. Dated 07/11/2017

39.11.3. Dated 07/16/2017

39.12. Order Record History

39.12.1. Dated 10/2016

39.12.2. Dated 07/2017

39.13. Patient Profile-Summary undated

39.14. Progress Notes dated 07/26/2017

39.15. Receiving Screening

39.15.1. Dated 10/21/2016

39.15.2. Dated 07/11/2017

39.16. Refusal of Treatment dated 07/16/2017

39.17. Staff Referral Form-Mental Health dated 10/21/2016

39.18. TB Record dated 07/21/2017

39.19. Withdrawal, Alcohol and Benzodiazepine, Nursing Documentation Pathway dated 07/11/2017

39.20. Withdrawal Opiate, Nursing Documentation Pathway

39.20.1. Dated 10/21/2016

39.20.2. Dated 07/11/2017

40. Michigan Criminal History Record

40.1. Dated 10/29/2016; 1406 hours

40.2. Dated 07/12/2017; 0858 hours

41. Mortality & Morbidity Report & Review-Herriges-Love, Dieter dated 08/21/2017

42. Officer Query Detail Report

42.1. Horne, Aaron printed on 12/11/2019; 1110 hours

42.2. Babich, Gary M.

42.2.1. Printed on 12/11/2019; 1108 hours

42.2.2. Printed on 12/11/2019; 1109 hours

43. Opinion and Order Granting Macomb County Defendants' Motion for Partial Dismissal and Granting in Part and Denying in Part Correct Care Solutions Motion to Dismiss filed 06/29/2020

44. Personnel Files

44.1. Babich, Gary M.

44.1.1. E-mail, "Deputy Babich," from David White to John Roberts dated 05/30/2013; 1253 hours

44.1.2. Internal Investigation, Office of Professional Standards. "Correction Deputy Gary Babich," dated 08/04/2014

44.1.3. Letters

44.1.3.1. From Gary Babich

44.1.3.1.1. Dated 10/08/2009

44.1.3.1.2. Dated 04/21/2010

44.1.3.2. From Undersheriff Kent B. Lagerquist toGary Babich dated 03/22/2010

44.1.3.3. From Undersheriff Kent B. Lagerquist toGary Babich dated 04/05/2010

44.1.3.4. From Undersheriff Kent B. Lagerquist toGary Babich dated 04/07/2010

44.1.4. Memorandums

44.1.4.1. "Correction Deputy Gary Babich #529," from Sergeant Greg Switchulis to Lieutenant Heythaler dated 10/06/2009

44.1.4.2. "Correction Deputy Gary Babich #529," from Undersheriff Kent B. Lagerquist to Command Staff

44.1.4.3. "Disciplinary Action-Misconduct Report Dated October 6, 2009," from Undersheriff Kent B. Lagerquist to Corrections Deputy Gary Babich Badge #529-dated 10/20/2009

44.1.4.4. "Disciplinary Action-Misconduct Report Dated March 11, 2010," from Undersheriff Kent B. Lagerquist to Corrections Deputy Gary Babich Badge #529 dated 05/25/2010

44.1.4.5. "Gary Babich-return to work," from Undersheriff Kent B. Lagerquist to Command Staff dated 09/23/2010

44.1.4.6. "Gary Babich-Suspension," from Undersheriff Kent B. Lagerquist to Command Staff dated 05/25/2010

44.1.4.7. "Gary Babich-90 Day Suspension," from Undersheriff Kent B. Lagerquist to Budget Office dated 05/25/2010

44.1.4.8. "Misconduct Report on Correction Deputy Gary Babich PAPF#14055, Badge #529," from Lt. Walter Zimny to Chief of Staff Anthony Wichersham dated 03/11/2010

44.1.4.9. "Misconduct Report on Correction Deputy Gary Babich PAPF#14055, Badge #529," from Sergeant Bruce R. Hill to Lt. Craig Sparks dated 05/02/2013

44.1.4.10. "Disciplinary Action-Misconduct Report Dated May 2, 2013," from Undersheriff Kent B. Lagerquist to Corrections Deputy Gary Babich Badge #529 dated 05/30/2013

44.1.4.11. "Disciplinary Action-Misconduct Report Dated August 4, 2014," from Undersheriff Kent B. Lagerquist to Corrections Deputy Gary Babich Badge #529 dated 09/24/2014

44.1.4.12. "Misconduct Report on Correction Deputy Gary Babich PAPF#14055, Badge #529," from Sergeant Matthew Murphy to Captain Elizabeth Darga dated 08/04/2014

44.1.5. Report of Performance Evaluation - Babich, Gary

44.1.5.1. Dated 10/01/2015

44.1.5.2. Dated 10/01/2016

44.1.5.3. Dated 10/01/2017

44.2. Horne, Aaron

45. Photographs-D 10 Unit and Cell 4 dated 07/26/2017

45.1. EX 1 - 3H5A5236.JPG

45.2. EX 2 - 3H5A5237.JPG

45.3. EX 3 -3H5A5238.JPG

45.4. EX 4 -3H5A5243.JPG

45.5. EX 5 - 3H5A5245.JPG

45.6. EX 6 - 3H5A5247.JPG

45.7. EX 7 - 3H5A5248.JPG

45.8. EX 8 - 3H5A5250.JPG

45.9. EX 9 - 3H5A5256.JPG

45.10. EX 10 - 3H5A5270.JPG

45.11. EX 11 - 3H5A5277.JPG

45.12. EX 12 - 3H5A5280.JPG

45.13. EX 13 - 3H5A5286.JPG

45.14. EX 14 - 3H5A5305.JPG

45.15. EX 15 - 3H5A5307.JPG

45.16. EX 16 - 3H5A5312.JPG

45.17. EX 17 - 3H5A5314.JPG

46. Photograph-Exhibit 26 (Horne) Med Cart Pass 07/26/2017; 0930 hours
47. Plaintiff's Motion to Compel Deposition of Sheriff Anthony Wickersham and for Production of Suicide Attempt Records filed 10/07/2020
48. Policies and Procedures

48.1. "Booking," Number 5.02 effective date 07/23/2013

48.2. "Classification Policy & Procedure," Number 5.04 effective date 03/21/2016

48.3. "Detoxification Cells," Number 5.16 effective 03/15/2009

48.4. "Duties and Responsibilities: Corrections Deputy," Number 5.01 effective date 10/21/2016

48.5. "Jail Staffing," Number 5.42 effective date 04/15/2009

48.6. "Mental Health Housing," Number 5.12 effective date 03/21/2016

48.7. "Prisoner Health Care," Number 5.45 effective date 10/23/2009

48.8. "Prisoner Rules," Number 5.20 effective date 06/20/2014

48.9. "Rule Violations, Sanctions, Disciplinary Hearing, Appeals, & Segregation," Number 5.21 effective date 04/15/2009

48.10. "Security Rounds," Number 5.07 effective date 03/21/2016

48.11. "Suicide Prevention and Response," Number 5.11 effective date 03/14/2016

49. Project Status Update, Macomb County Jail and Sheriff's Office dated 02/28/2019
50. PRS Contact Request Form dated 10/16/2016
51. Psychological Autopsy,

51.1. Coddington, Todd dated 02/20/2015

51.2. Paige, Alfred dated 09/14/2018

52. Report of Psychological Autopsy,-Sexton, Vanessa dated 02/20/2015
53. "Technical Assistance Report on Jail Suicide Prevention Practices within the Macomb County Sheriff's Office," Lindsay M. Hayes, National Center on Institutions and Alternatives, 06/19/2002
54. Training Files

54.1. Babich, Gary M.

54.2. Horne, Aaron

55. Video Recordings-D Unit Day Room 10

55.1. Dated 07/21/2017

55.1.1. From 7:44:41: hours to 7:45:33PM

55.1.2. From 8:03:55 PM to 8:09:53 PM

55.1.3. From 8:19:48 PM to 8:20:15 PM

55.1.4. From 8:37:03 PM to 8:37:35 PM

55.1.5. From 9:32:55 PM to 9:33:27 PM

55.1.6. From 10:04:39 PM to 10:05:30 PM

55.1.7. From 10:28:11 PM to 10:28:37 PM

55.1.8. From 11:20:43 PM to 11:21:24 PM

55.2. Dated 07/22/2017

55.2.1. From 12:15:14 AM to 12:16:06 AM

55.2.2. From 1:07:45 AM to 1:08:27 AM

55.2.3. From 2:03:42 AM to 2:04:24 AM

55.2.4. From 3:53:31 AM to 3:54:15 AM

55.2.5. From 4:49:55 AM to 4:50:37 AM

55.2.6. From 5:44:04 AM to 5:44:53 AM

55.2.7. From 6:34:32 AM to 6:35:12 AM

55.2.8. From 7:33:56 AM to 7:34:31 AM

55.2.9. From 7:34:44 AM to 7:48:08 AM

55.2.10. From 8:31:28 AM to 8:32:03 AM

55.2.11. From 9:22:48 AM to 9:23:28 AM

55.2.12. From 10:19:27 AM to 10:20:12 AM

55.2.13. From 10:38:49 AM to 10:46:21 AM

55.2.14. From 11:08:46 AM to 11:09:23 AM

55.2.15. From 12:03:09 PM to 12:06:18 PM

55.2.16. From 12:47:59 PM to 12:48:44 PM

55.2.17. From 1:41:53 PM to 1:42:35 PM

55.2.18. From 2:28:05 PM to 2:28:34 PM

55.2.19. From 3:25:46 PM to 3:26:22 PM

55.2.20. From 4:19:16 PM to 4:19:55 PM

55.2.21. From 5:13:07 PM to 5:13:40 PM

55.2.22. From 5:22:54 PM to 5:27:32 PM

55.2.23. From 6:08:40 PM to 6:09:24 PM

55.2.24. From 7:00:08 PM to 7:08:34 PM

55.2.25. From 7:53:28 PM to 7:54:20 PM

55.2.26. From 8:05:33 PM to 8:07:59 PM

55.3. Dated 07/23/2017

55.3.1. From 12:14:52 AM to 12:16:02 AM

55.3.2. From 1:09:59 AM to 1:11:19 AM

55.3.3. From 2:04:25 AM to 2:09:32 AM)

55.3.4. From 2:59:10 AM to 3:01:16 AM-

55.3.5. From 3:11:22 AM to 3:12:38 AM

55.3.6. From 3:51:54 AM to 3:52:44 AM

55.3.7. From 4:50:38 AM to 4:52:08 AM

55.3.8. From 5:47:40 AM to 5:49:01 AM

55.3.9. From 6:32:38 AM to 6:35:27 AM

55.3.10. From 7:30:07 AM to 7:30:51 AM

55.3.11. From 7:48:31 AM to 8:04:08 AM

55.3.12. From 8:22:10 AM to 8:24:16 AM

55.3.13. From 8:36:13 AM to 8:38:02 AM

55.3.14. From 9:19:19 AM to 9:20:04 AM

55.3.15. From 10:11:34 AM to 10:18:56 AM

55.3.16. From 10:28:07 AM to 10:31:22 AM

55.3.17. From 11:10:39 AM to 11:11:44 AM

55.3.18. From 12:01:09 PM to 12:16:58 PM

55.3.19. From 12:48:26 PM to 12:49:21 PM

55.3.20. From 1:44:25 PM to 1:45:08 PM

55.3.21. From 2:27:47 PM to 2:28:48 PM

55.3.22. From 3:25:10 PM to 3:25:57 PM

55.3.23. From 4:20:24 PM to 4:21:04 PM

55.3.24. From 5:08:36 PM to 5:09:51 PM

55.3.25. From 5:20:34 PM to 5:30:47 PM

55.3.26. From 6:05:29 PM to 6:06:11 PM

55.3.27. From 7:00:10 PM to 7:01:56 PM

55.3.28. From 7:52:53 PM to 7:53:26 PM

55.3.29. From 8:27:40 PM to 8:31:38 PM

55.3.30. From 8:48:02 PM to 8:48:37 PM

55.3.31. From 9:43:49 PM to 9:44:27 PM

55.3.32. From 10:33:22 PM to 10:34:47 PM

55.3.33. From 11:17:16 PM to 11:27:51 PM

55.4. Dated 07/24/2017

55.4.1. From 12:12:54 AM to 12:13:47 AM

55.4.2. From 1:09:10 AM to 1:10:16 AM

55.4.3. From 2:04:20 AM to 2:05:47 AM

55.4.4. From 2:59:35 AM to 3:00:46 AM

55.4.5. From 3:53:27 AM to 3:54:31 AM

55.4.6. From 4:48:11 AM to 4:49:18 AM

55.4.7. From 5:42:13 AM to 5:43:10 AM

55.4.8. From 6:33:31 AM to 6:34:45 AM

55.4.9. From 7:30:11 AM to 7:31:34 AM

55.4.10. From 7:35:54 AM to 7:46:04 AM

55.4.11. From 8:22:44 AM to 8:23:52 AM

55.4.12. From 9:20:09 AM to 9:21:05 AM

55.4.13. From 9:43:35 AM to 9:49:16 AM

55.4.14. From 10:11:40 AM to 10:12:14 AM

55.4.15. From 11:58:55 AM to 12:12:00 PM

55.4.16. From 12:49:27 PM to 12:50:38 PM

55.4.17. From 1:37:28 PM to 1:38:26 PM

55.4.18. From 2:28:09 PM to 2:28:43 PM

55.4.19. From 3:23:45 PM to 3:25:23 PM

55.4.20. From 4:12:53 PM to 4:14:12 PM

55.4.21. From 5:05:45 PM to 5:06:44 PM

55.4.22. From 5:35:13 PM to 5:06:44 PM

55.4.23. From 5:59:43 PM to 6:01:13 PM

55.4.24. From 6:54:11 PM to 6:55:12 PM

55.4.25. From 7:47:32 PM to 7:48:09 PM

55.4.26. From 8:04:43 PM to 8:06:56 PM

55.4.27. From 8:45:00 PM to 8:46:23 PM

55.4.28. From 9:38:29 PM to 9:39:33 PM

55.4.29. From 10:27:10 PM to 10:28:16 PM

55.4.30. From 11:19:43 PM to 11:21:06 PM

55.5. Dated 07/25/2017

55.5.1. From 12:14:18 AM to 12:15:35 AM

55.5.2. From 1:09:23 AM to 1:10:30 AM

55.5.3. From 2:05:57 AM to 2:07:10 AM

55.5.4. From 2:59:10 AM to 3:01:16 AM

55.5.5. From 3:56:02 AM to 3:57:12 AM

55.5.6. From 4:49:36 AM to 4:50:42 AM

55.5.7. From 5:44:45 AM to 5:45:56 AM

55.5.8. From 6:34:23 AM to 6:35:27 AM

55.5.9. From 7:30:16 AM to 7:31:26 AM

55.5.10. From 7:35:49 AM to 7:47:51 AM

55.5.11. From 8:23:16 AM to 8:24:58 AM

55.5.12. From 9:17:19 AM to 9:17:56 AM

55.5.13. From 9:25:08 AM to 9:30:00 AM

55.5.14. From 10:15:10 AM to 10:15:52 AM

55.5.15. From 11:08:30 AM to 11:09:00 AM

55.5.16. From 11:56:25 AM to 12:03:58 PM

55.5.17. From 12:43:26 PM to 12:44:28 PM

55.5.18. From 1:36:41 PM to 1:37:40 PM

55.5.19. From 2:28:03 PM to 2:28:34 PM

55.5.20. From 3:22:25 PM to 3:24:32 PM

55.5.21. From 4:12:57 PM to 4:14:04 PM

55.5.22. From 5:01:50 PM to 5:02:51 PM

55.5.23. From 5:42:39 PM to 5:53:05 PM

55.5.24. From 5:56:04 PM to 5:56:38 PM

55.5.25. From 6:51:27 PM to 6:51:56 PM

55.6. Dated 07/26/2017

55.6.1. From 12:16:18 AM to 12:17:38 AM

55.6.2. From 1:08:41 AM to 1:09:53 AM

55.6.3. From 2:00:39 AM to 2:01:22 AM

55.6.4. From 3:00:48 AM to 3:01:56 AM

55.6.5. From 3:51:53 AM to 3:52:38 AM

55.6.6. From 4:50:00 AM to 4:51:18 AM

55.6.7. From 5:43:18 AM to 5:44:06 AM

55.6.8. From 6:34:45 AM to 6:36:02 AM

55.6.9. From 7:29:12 AM to 7:30:20 AM

55.6.10. From 7:34:31 AM to 7:51:10 AM

55.6.11. From 7:52:27 AM to 7:53:01 AM

55.6.12. From 8:20:00 AM to 8:20:59 AM

55.6.13. From 8:39:17 AM to 8:40:01 AM

55.6.14. From 9:19:47 AM to 9:20:41 AM

55.6.15. From 9:30:50 AM to 9:20:41 AM

55.6.16. From 10:14:02 AM to 10:14:37 AM

55.6.17. From 11:07:15 AM to 11:08:25 AM

55.6.18. From 12:02:38 PM to 12:10:21 PM

56. Video Screen Capture

56.1. 10_14_10 am (5).png

56.2. 10_14_10 am (6).png

56.3. 10_14_11 am (1).png

56.4. 10_14_11 am (2).png

56.5. 10_14_11 am (3).png

56.6. 10_14_11 am (4).png

56.7. 10_14_11 am (5).png

56.8. 10_14_11 am (6).png

56.9. 10_14_11 am (7).png

56.10. 10_14_11 am (8).png

56.11. 10_14_11 am.png

56.12. 10_14_12 am (1).png

56.13. 10_14_12 am (2).png

56.14. 10_14_12 am (3).png

56.15. 10_14_12 am (4).png

56.16. 10_14_12 am (5).png

56.17. 11_07_53 am.png

56.18. 11_07_54 am.png

56.19. 11_07_55 am (1).png

56.20. 11_07_55 am (2).png

56.21. 11_07_55 am (3).png

56.22. 11_07_56 am (1).png

56.23. 11_07_56 am (2).png

57. Jail and Prison Legal Issues: An Administrator's Guide, William Collins, Esq., published by the American Jail Association, updated 2006

58. Performance-based Standards for Adult Local Detention Facilities, 4th Edition, American Correctional Association, June 2004

    58.1. 2016 Standards Supplement, American Correctional Association, 2016

59. Standards for Health Services in Correctional Institutions, 3rd Edition, American Public Health Association, 2003

60. Standards for Health Services in Jails, National Commission on Correctional Health Care, 2008

61. The Supreme Court and Corrections: The Landmark Cases That Have Shaped America's Prisons and Jails, William Collins, Esq., published by the Civic Research Institute, 2019

62. *Bell v Wolfish*, 441 U. S. Supreme Court, 520 (1979)

63. *Estelle v. Gamble*, 429 U.S. 97; 97 S. Ct. 285; 50 L. Ed. 2d 251; 1976 U.S. LEXIS 175, (1976)

64. *Farmer v Brennan* (92-7247), 511 U.S. 825 (1994)

65. *Grabow v. County of Macomb*, 580 Fed.Appx. 300 (2014)

66. *Kingsley v Hendrickson, No. 14-6368,* U. S. Supreme Court, 135 S. Ct. 2466, 2015 U.S. LEXIS 4073 (2015)

67. *Turner v Safley*, 482 U.S. 78 482 U.S. 78 (1987)

## VII. EXHIBITS TO BE USED TO SUMMARIZE OR SUPPORT OPINIONS

I may employ some, or all, of the materials referred to in the previous section to summarize or support my opinions. This report is predicated on the facts as presented through reviewing the provided materials. Attempts are made to avoid making judgments based solely upon the involved individual's credibility.

## VIII. FOCUS OF EXAMINATION

My review focused on the following issues:

*A.* ***Was the Macomb County Sheriff's Office aware of the risk posed by the holes in the inmate bunk beds?***

*B.* ***Did the review of the officers in the conduct of the hourly security rounds after a critical incident meet acceptable correctional practice for the prevention of self-harming behavior as expected by a reasonable correctional administrator?***

*C.* ***Were the Macomb County Sheriff's Office policies and practices for the prevention of the covering of cell windows appropriately followed prior to the suicide of Mr. Herriges-Love as expected by a reasonable correctional administrator?***

*D.* ***Did the correctional officers of the Macomb County Sheriff's Office receive training in suicide prevention as required by the Macomb County Sheriff's Office's policies and procedures?***

## IX. OPINION

My opinion is predicated on a comprehensive review of the information listed in Section VI. My opinions and conclusions are given within a reasonable degree of professional certainty in those areas involving jail and correctional issues, acceptable correctional practice, supervision and administration. I reserve the right to supplement or alter my opinions and conclusions should additional information be received.

A. ***The Macomb County Sheriff's Office was aware of the risk posed by the holes in the inmate bunk beds.***

B. ***The review of the officers in the conduct of the hourly security rounds after a critical incident did not meet acceptable correctional practice for the prevention of self-harming behavior as expected by a reasonable correctional administrator.***

C. ***Depending on the recounting of events, the Macomb County Sheriff's Office policies and practices for the prevention of the covering of cell windows may, or may not, have been appropriately followed prior to the suicide of Mr. Herriges-Love as expected by a reasonable correctional administrator.***

D. ***Based upon the training materials reviewed, the correctional officers of the Macomb County Sheriff's Office did not receive annual in-service training in suicide prevention as required by the Macomb County Sheriff's Office's policies and procedures.***

## X. COMMENTS AND BASIS FOR OPINION

In preparing my opinion, I relied upon my training and experience in corrections as an officer, instructor and administrator along with training and information provided by attorney and correctional law expert Mr. William Collins, Esq. in Jail and Prison Legal Issues: An Administrator's Guide[1]. Additionally, my opinions and basis for opinions reflect my continuing studies and research of correctional management issues. Those studies and research include frequent review of case studies, correctional articles[2] and participation in correctional conferences and workshops conducted by, the Americans for Effective Law Enforcement; Institute for the Prevention of In-custody Death; the American Jail Association, and the American Correctional Association, both as a presenter and as a participant.

My opinions arise from the information reviewed; are the product of that review; reflect relevant professional duties; standards of care; and, accepted practices in the field of corrections. Any reference to court opinions and/or use of legal terms reflects my training and experience in the correctional profession and as a correctional practices expert. My reference to cases or use of any terms that have a specific legal definition is not intended to express any legal expertise beyond the scope of my experiences and training as a correctional officer, and correctional administrator, and as used by a knowledgeable correctional administrator in operating that which the Courts have determined to be a Constitutionally-based correctional facility.

In corrections, agency policies and practices are intended to conform to Constitutionally-based duties; applicable state regulatory standards; and standards of care and training. Supervision is intended to ensure knowledge and application of those Constitutional duties by correctional staff. Policy is a guideline enacted through procedures that are intended to demonstrate Constitutionally-based acceptable correctional practices. The various correctional duties, standards of care and accepted practices have all evolved over time, illustrating "the evolving standards of decency that mark the progress of a maturing society."[3]

The phrase "acceptable correctional practice" refers to how objectively reasonable correctional professionals perform, or should perform, their duties based on legal policy codified and adopted into policy and procedure, that is published, trained and supervised. "Acceptable correctional practice" does not refer to "best practice" or "ideal practice", but rather to those situations and practices that correctional personnel confront as part of their customary duties. They generally fall within a range of options available to the officer in any given situation.

I relied on my training, experience and knowledge as a correctional administrator in evaluating the circumstances surrounding the care and custody on Mr. Dieter Herriges-Love while in the Macomb County Jail on July 26, 2017.

---

[1] Jail and Prison Legal Issues: An Administrator's Guide, William Collins, Esq., published by the American Jail Association, updated 2006

[2] Correctional publications that I routinely read and review provide current thoughts, issues, problems, solutions, relevant case law include the *Correctional Manager's Report*; the *Correctional Health Care Report*; the *Correctional Law Reporter*; the *Correctional Mental Health Report*; *American Jails* magazine; Jail and Prisoner Law Bulletin; AELE Monthly Law Journal; and *Corrections Today* magazine.

[3] *Estelle v. Gamble*, 429 U.S. 97; 97 S. Ct. 285; 50 L. Ed. 2d 251; 1976 U.S. LEXIS 175, (1976)

## XI. ANALYSIS

### *Risk Posed by Bunk Holes*

Beginning with the report provided the Macomb County Sheriff's Office,[4] at the request of Ms. Michelle Sanborn, after a series of in-custody suicides.

> "It was the close proximity-of the suicides to each other that prompted concern within the MCSO. In order to independently assess current practices as well as offer any appropriate recommendations to suicide prevention policies and procedures within the MCSO, Sheriff Mark Hackel and Jail AdministratorMichelle Sanborn decided to seek the assistance of an independent outside consultant. The services of this writer were subsequently selected to conduct the assessment."[5]

One of the recommendations provided by Mr. Hayes was to remediate the potential tie-off point offered by the drain holes located in the bunk beds throughout the facility.

> "First, all cells housing suicidal inmates should provide full visibility and be as "suicide-resistant as possible. As such, and as a first priority, all cells within the Mental Health Unit should be closely examined and obvious protrusions removed (e.g., bunk holes and hooks on desks). In addition, light fixtures should be flush with the wall, and wall and door vents should be replaced with vents that contain. smaller hole openings (e.g., no larger than 3/16 inches or 16-mesh per square inch). Following completion of the recommended renovation of Mental Health Unit cells, it is strongly recommended that other "special housing unit" (e.g., booking/holding pre-classification, medical, disciplinary/administrative segregation, etc.) cells be similarly renovated, **followed by all other cells in the facility**."[6] (Emphasis added)

While parts of this recommendation were followed and the bunk bed holes plugged, bunk beds in the general population remained susceptible to using the holes for suicide attempts. The continuation of inmates using the bunk bed holes for suicide attempts and, in several cases, successful suicide, apparently drove the Macomb County Sheriff's Office to request funding from the Macomb County Board of Supervisors to address the issue of the bunk bed holes.[7]

In this Board of Commissioners meeting, the issue of the bunk bed holes continuing to be used for suicide attempts, and successful suicides, since the time of Mr. Hayes report was well recognized. Both the Sheriff's Department representative, Captain Walter Zimny, and the Board's Corporate Counsel, Mr. John Schapka, articulated the need for funding the remediation of the bunk bed holes. Both Captain Zimny and Mr. Schapka recounted the almost two decade long recognition of the problems presented by the bunk bed holes.

In the intervening years between Mr. Hayes report and the Board of Commissioners meeting, successful sui-

---

[4] Jail Administrator Michelle Sanborn requested the assistance of Mr. Hayes after the jail experienced a series of inmate suicides.

> "What I can tell you you is that when I took over as jail administrator, there were no in custody deaths for a period of six or seven years. And then we had a string of deaths in a close period of time. So we took a lot of action, and did a lot of researching, and started acquiring all of the data that we could to help prevent deaths from occurring in the future." Sanborn 22/8-14

[5] "Technical Assistance Report on Jail Suicide Prevention Practices within the Macomb County Sheriff's Office," Lindsay M. Hayes, National Center on Institutions and Alternatives, 06/19/2002, p 1

[6] Ibid, p. 21

[7] See Macomb County Board Meeting 3-14-18.mp4 (Board of Commissioners) presentation.

cides were continuing to occur in the jail, some of which utilized the bunk bed holes.[8] The issue of inmate in-custody deaths being a significant problem and perceived as not being properly addressed was stated by Sixth Circuit Court of Appeals Justice Bernice Bouie Donald in the case *Grabow v. County of Macomb.*[9] Justice Donald noted her concerns about the number of suicides occurring in the Macomb County Jail.

> "I write to note the troubling statistics surrounding suicides in the Macomb County Jail."[10]
>
> "Macomb County Jail's five suicides alone accounted for nearly twenty percent of Michigan's twenty-four total reported jail inmate deaths by any cause in 2011, id. at 15, despite the fact that the Jail processed only about eight percent of the state's total annual jail inmates and held only seven percent of the state's jail inmates at any one time, see supra n. 1. This case is not the first time that this Court has taken notice of Macomb County Jail's high suicide rate."[11]
>
> "And yet the suicides keep happening. How many times should this question come before this Court before the need for adequate suicide precautions for mentally-ill inmates becomes "clearly established law" for which officials can be held accountable? How many times should Macomb County come before this Court before "the need for better training [becomes] so obvious" that it should be held liable? While current law offers no refuge for *Grabow*, the time may come for this Court to rethink what constitutional protections are available to mentally ill, potentially suicidal inmates and what sort of liability may be imposed on defendants like Macomb County, where these suicides continue to occur at an alarming rate."[12]

Clearly, the presentation by Captain Zimny, and the remarks offered by the Corporate Counsel, Mr. Schapka, before the Macomb County Board of Commissioners demonstrates their awareness of the same problem Justice Donald commented upon, successful suicides. Though efforts had previously been made by the jail to prevent inmate suicides, the presentation by Captain Zimny indicates his awareness as the Sheriff's representative of the problems posed by the continued existence of the bed bunk holes. Hence, the Sheriff's request for funding to fix the bed hole problem.

***<u>Critical Incident Review and Supervision of Officer Observation Practices</u>***

The occurrence of critical incidents in the jail offer an opportunity for the jail administration and supervisory staff to deconstruct the events and actions of staff both prior to and during the critical incident. Supervision is not just a real time activity. Actual supervision of the line staff in the performance of their duties in real time is sporadic and labor intensive. Most jails, as with the Macomb County Jail, have supervisors periodically checking in on staff while they perform the necessary tasks assigned with their posts. The Macomb County Jail policy on "Security Rounds," directs supervisory staff to ensure the rounds are completed in an appropriate manner.

"Jail Command Officers will conduct periodic checks of rounds to ensure that they are completed and logged

---

[8] For examples, see Kristina Prochnow's suicide dated 08/15/2011; Todd Coddington's suicide dated 07/22/2017; and, AlfredPaige suicide dated 08/23/2018

[9] *Grabow v. County of Macomb*, 580 Fed. Appx. 300 (2014)

[10] Ibid, p. 9

[11] Ibid, p. 9

[12] Ibid, p. 9 & 10

in accordance with the law and the intent of this policy."[13]

A typical, minimal correctional practice is to have the shift supervisor make at least one round per shift through the areas under their supervision. This is the case with Macomb County according to Sergeant Aaron Horne.

> "Are you aware of any requirement that jail command officers are supposed to do period checks of the rounds to make sure that they're completed and logged correctly?
>
> We, we go through each floor and you sign off on the floor sheet or the log if you visited the floor and did a visual inspection of their general work area and also of the log sheet."[14]

Depending on the time of the supervisory check, the supervisor might not be able to observe the officers in the performance of essential duties, such as the 60-minute security rounds. In this case, on the morning of 07/26, the Tower Logbook notes that the shift supervisor, Sergeant Stanley, was making his rounds at 0825 hours.[15] The same Logbook indicates that the most recent welfare observation was concluded at 0820 hours.[16]

Sergeant Stanley may, or may not, have had the opportunity to observe the staff in the conduct of these security rounds. This is not an unusual occurrence; hence, the importance of deconstructing the incident as a means of quality assurance that the staff are appropriately conducting their duties in the time preceding the incident. As opposed to taking the officer, or officers, at their word that they were doing everything appropriately and correctly, some review of their activities would be an acceptable correctional response. There is no indication that this occurred in this critical incident involving Mr. Herriges-Love.

The Death Investigation conducted after Mr. Herriges-Love suicide included a timeline of the conduct of the security rounds in the hour leading up to the discovery of Mr. Herriges-Love. According to the timeline, Deputy Gary Babich conducted a welfare observation of the D-10 housing unit at 1107 hours.[17]

> "The following approximate incident times are taken from the Pelco video:
>
> **11:07:14** C/D Babich enters D-Unit on Floor 11 through cross over door (Security Round #4) He can be seen going by and looking into cells. (KeyScan 11:01:20)
>
> **11:07:52** C/D Babich comes down the stairs and checks Floor 10 cells. He can be seen going by and looking into cells. He stops and does a double take at 10D3. (KeyScan 11:01:57)"

There is no analysis as to whether the conduct of this welfare observation was conducted appropriately and in an acceptable correctional manner. The investigating officer, Sergeant Jeffrey Swan, simply recorded Deputy Babich's statement regarding his conduct of this 1107 hours welfare observation.

> "Sergeant Jeffrey Swan and I spoke with C/D Gary Babich. He stated that he checks every cell when conducting security rounds and said that he would stop and address any issue that would arise. If there was some-

---

[13] "Security Rounds," Number 5.07 effective date 03/21/2016, "Procedure," "H," p. 2

[14] Horne 135/19-25; 136/1

[15] Logbooks-Tower 10 start dated 07/26/2017; 0655 hours, p. 10

[16] Ibid

[17] Death Investigation, Number 56349-17 dated 07/26/2017 (Herriges-Love, Dieter Kendrick), p. 14

thing blocking the view into the cell, he would have removed it immediately. C/D Babich said that he always checks the cells on every round. If there was a problem, he would address it then. He states that he recalls nothing out of the ordinary in regards to 10D4 when he did the previous security round prior to the incident. He did not recall seeing every inmate individually, but said that there were no problems at the time of his security round."[18]

I have reviewed no document indicting that a supervisory review of the appropriateness and adherence to policy and practice was conducted for Deputy Babich's welfare observation at 1107 hours or the prior times of this security procedure occurring. There is no indication that anyone questioned Deputy Babich's conduct of the welfare observation only taking 54 seconds; or that he fails to look into either the top or bottom tier end cells; or that he does not seem to break stride during his movement through the unit. The only clear indicator that he checked a cell occurred when he stopped and looked into what appears to be D-10 cell 3.

There are generally two common practices related to accessing the cells by inmates during recreation, or lock-out, time. Some jails permit the cells doors to remain unsecured throughout the recreation or lock-out times. Other jails close and secure the cell doors when the inmates are out in the pod area for recreation or lock-out. In Macomb County Jail, they allow the doors to remain open during recreation or lock-out times. Both are acceptable correctional practices. Both are accompanied by positives and negatives regarding the procedure.

Leaving the doors unsecured provides inmates access to their cell area during recreation. This gives inmates access to their own toilets, personal commissary items, bedding, writing materials, etc. Officers are less bothered with opening and closed the cells when an inmate wants to retrieve something forgotten in the cell. Inmates are able to lie upon their beds as opposed to sitting/lying on the pod floor or sitting on the stairs when the tables are occupied.[19] Inmate access to the cell toilet may be necessary if there is no communal toilet located in the pod area.

Securing the doors when the inmates are out on recreation or lock-out puts them in a more readily observable position. The downside is that the inmates routinely ask the staff for access to the cells; bring unwanted and prohibited items out of the cell into the pod area; and, are generally more uncomfortable which can lead to misbehaviors.

The downside is that even on recreation time many inmates will choose to remain in their cell making ready observation of them more difficult, therefore the need to actively look into each cell. In this situation multiple inmates can congregate in any given cell, including those that are not their own. Unwanted and prohibited activities, such as sexual activity; assault; suicidal gestures; medical problems; escape attempts or contraband; can more readily occur outside the view of the custody staff. All this is said only to indicate that a greater need for more attention to the conduct of the security rounds.

The need for supervisory attention to how the officers conduct of the security rounds is a common and ongoing issue for correctional supervisors. That this situation occurs at Macomb County Jail can be gleaned from the Disciplinary Action imposed on Deputy Babich for not appropriately conducting a security and welfare observation several years before Mr. Herriges-Love suicide.

---

[18] Ibid, p. 15

[19] Inmates have to lay one the floor or sit on the stairs in these units because (viewing the video) their are only two tables in each unit (assuming D-10 is a typical design) with four stools around the table. This provide actually seating space for only 8 inmates in a unit housing 30 inmates.

"On May, 12, 2013 at approximately 0710 hrs, Deputy Babich conducted the first security round of the day. Deputy Gary Babich did not conduct a roll call and did not verify the accurateness of the inmates housed on floor 4/5. Every inmate was not observed during the security round."[20]

My review of the video recordings of the custody officers conducting their security and security rounds in the days prior to Mr. Herriges-Love suicide indicates a significant disparity in the custom and practice of the conduct of the security and security rounds by the custody officers. In many cases the security and security rounds by the custody staff amount to little more than simply walking through the housing unit. This can be best illustrated by re-viewing the method of conducting these security and welfare by two different officers on the night shift.

The male officer seen in the video recording from 2:59:35 AM to 3:00:46 AM on 07/24/2017 demonstrates an appropriate, and effective, security and welfare observation. As a correctional trainer, supervisor and administrator, this is the prototypical welfare observation. This observation round takes him 1 minute and 7 seconds to complete. Clearly the officer is actively looking into each cell for signs and symptoms of distress. He even employs a flashlight to assist him in his observations. This same officer can be seen on previous, and subsequent observations, applying the same diligence to his observation tasks. The time it takes for him to conduct the observation in this same units varies very little from hour to hour, and day to day. The same cannot be said for the female officer on the same shift.

The female officer can be seen making a security round from 3:51:54 AM to 3:52:44 AM on 07/23/2017 in which she does not appear to look into any cell, never breaks her quick walk, and never checks either of the end tier cells. A security round that took the male officer 1:07 seconds to conduct takes her 40 seconds. A review of those security rounds made by this female officer shows that she has a custom and practice of conducting her security rounds in this manner.

A review of the security rounds conducted from 07/23/2017 to 07/26/2017 on the other shifts shows similar disparities in the conduct of the rounds by the various officers. This is the type of auditing that these critical incidents should initiate with supervisory and administrative staff. I have not reviewed any document indicating that anyone reviewed the conduct of the security rounds for adherence to agency policy and procedures. Given Deputy Babich past disciplinary history in this specific area, a reasonable correctional administrator would have reviewed the previous security round videos to ensure that Deputy Babich's statement of his activities was accurate.

***Covering of Cell Windows***

Needless to say, covering the windows of the cells is not an acceptable correctional practice as the windows are intended to provide the custody staff the opportunity to see into the cell for a variety of reasons: welfare checks; security rounds; identifying signs and symptoms of distress; and, prior to cell entry. Rules prohibiting inmates from covering of cell windows are a common and acceptable correctional practice.

It is important to bear in mind that many jails routinely cover the cell windows themselves. Jails use a variety of methods, such as magnetic shades; metal flaps; and even duct tape. This is typically done for a variety of reasons: to prevent inmates from watching staff; to prevent inmates from seeing other female, or male, inmates; to prevent inmates from communicating with one another; etc. Inmates cover the windows to their cells also for a variety of reasons, some nefarious, some mundane. Regardless of who is covering the windows, us or them, obscuring the

---

[20] "Misconduct Report on Correction Deputy Gary Babich PAPF#14055, Badge #529," from Sergeant Bruce R. Hill to Lt. Craig Sparks dated 05/02/2013

ability to see within a cell is problematic for both us and them. Obscuring the window just means we have to increase our diligence in checking on each inmates to ensure their welfare.

The seriousness of the covering of the window is commensurate with the acuity of risk and needs of the person, or persons, housed in the cell. A reasonable correctional officer would perceive a greater issue with the window being covered in cells containing high risk inmates (escape, violence, mental health, acute medical, suicidal) versus inmates in general population housing with no demonstrated need for a higher level of awareness.

It seems clear that the Macomb County Jail has an appropriate policy prohibiting the windows being covered.[21] It also seems clear that some officers were more diligent in keeping the windows free from obstruction at all times, while others were more flexible on the issue given the perceived nature of why the window was covered. Covering the window of a cell in general population in order to achieve a modicum of privacy is not an unusual occurrence. Inmates housed in multiple occupancy cells have few opportunities to have privacy when using the toilet, as several of the inmates housed with Mr. Herriges-Love stated.

> "I came back from Fast track to the unit. When I came in I noticed the Cell # 10D4 had the shit shade (paper) over the window, this was just as the Commisary (sic) was beginning to start about 30 min or more later they began to feed us chow."[22]
>
> "Some of the inmates in this case testified that the shade or the door cell window would be blocked with paper. They referred to that as a shit shade.
>
> A shade. Pardon me. I thought -- I misunderstood altogether. I thought you said shape as well with no shit. Pardon me. Yes, the shade, yes, the paper on the window, pardon me, yes.
>
> So you now have an understanding of what —
>
> Absolutely.
>
> -- that term means. **And why would an inmate place that on his cell window?**
>
> **Well, privacy, I suppose. That's what I would use it for.**
>
> **Right.**
>
> **I have used it.**
>
> **Right. And you've seen that before in the facility, correct?**
>
> **Yes.**
>
> **And I think you indicated earlier that you've seen that from time to time inside the facility, correct?**
>
> **Yes, I've used it myself, sure.**
>
> Okay. **You've used it yourself. And it's really for privacy reasons, correct?**
>
> **Absolutely, yeah.**
>
> When you see the shade, so to speak, on a cell window, you generally have an understanding that the person

---

[21] "Vents, windows and cell lights will not be covered." "Prisoner Rules," Number 5.20 effective date 06/20/2014, Appendix 1, p. 2

[22] Interview of Inmate Jamar Thomas, Death Investigation, Number 56349-17 dated 07/26/2017 (Herriges-Love, Dieter Kendrick), p. 5

is in the cell using the commode, correct?

Correct, yes.

And your first thought isn't in there, oh, no, that inmate is in there killing himself, is it?

No."[23] (Emphasis added)

And,

"A custody officer making a security round who notices a shit shade would not be surprised that an inmate is using the commode, correct?

No."[24]

Officers have to be trained to be "firm but fair," judicious in the application of inmate rules and regulations. The use of window for short periods of time, such as described by inmate Jeremy Gordon is an example of the officers being "firm but fair." The inmate, in this case Mr. Herriges-Love, is allowed to use the shade while on the toilet, but the officer when observing the shade needs to interact with the inmate, in this case Mr. Herriges-Love, to inform him the shade must come down immediately when finished. This is typically accomplished verbally, talking through the cell door, ensuring some response from the inmate.

When the officer notices the shade up for longer than a reasonable length of time to accomplish the bodily function, then it is incumbent upon the officer to investigate and enforce the rule. The question in this case is how long was the shade in place.

According to inmate Joseph Piasecki, the window had been covered for a period of time prior to Mr. Herriges-Love being discovered. This period of time would have included the time of Deputy Babich's security round at 1107 hours.

"I was playing chess about **10:30ish at the back table, that guys window was covered,** I read it say put some water on it. The dep did his round and walked right by his room, We then had commissary then called for lunch when he was found. Maybe the dep should of done his job and opened the door instead of just walking by it."[25] (Emphasis added)

A similar observation of the window being covered was made by inmate Jerry Pacquette.

"He **last saw Dieter at approximately 1030hrs around med pass and then after that observed something covering** Dieter's door."[26] (Emphasis added)

Deputy Babich's interview did not indicate whether there was something covering Mr. Herriges-Love cell window, or that he spoke to Mr. Herriges-Love, or that he even saw Mr. Herriges-Love during the security round.

"Sergeant Jeffrey Swan and I spoke with C/D Gary Babich. He stated that he checks every cell when conducting security rounds and said that he would stop and address any issue that would arise. If there was some-

[23] Gordon 52/19-25; 53/1-24

[24] Gordon 54/12-15

[25] Interview of Inmate Joseph Piasecki, Death Investigation, Number 56349-17 dated 07/26/2017 (Herriges-Love, Dieter Kendrick), p. 10

[26] Interview of Inmate Jerry Pacquette, Death Investigation, Number 56349-17 dated 07/26/2017 (Herriges-Love, Dieter Kendrick), p. 10

thing blocking the view into the cell, he would have removed it immediately. **C/D Babich said that he always checks the cells on every round.** If there was a problem, he would address it then. He states that he recalls nothing out of the ordinary in regards to 10D4 when he did the previous security round prior to the incident. **He did not recall seeing every inmate individually, but said that there were no problems** at the time of his security round."[27] (Emphasis added)

According to the Macomb County Jail policy, and expected correctional practice, the security rounds are intended to ensure that all the inmates are present (i.e., not escaped or missing); that there are no prohibited activities occurring; and, that there are no inmates demonstrating obvious signs or symptoms of distress.

"PURPOSE:

A. To ensure the safe and secure operation of the jail facility, to protect its occupants, as well as the community.

B. To implement objective preventative patrol (rounds) to detect and/or prevent escape attempts, inmate disturbances, potential disorders, fires, illegal activities, tampering with jail/security equipment, sexual assaults and suicide attempts.

C. To detect inmate problems, such as illness or emotional disorders.

D. To prevent civil lawsuits claiming malfeasance, negligence or nonfeasance."[28]

To accomplish this the officer has to have visual (or in the case of using the shade, auditory) observation of all the inmates. This is articulated in the Macomb County policy.

**"Visual observation of each inmate (including skin and breathing)** will be made during security rounds."[29] (Emphasis added)

It would appear from the statement of Deputy Babich that he did not visually observe "each inmate" during his round in Unit D-10 on 07/26 at 1107 hours or the one he appears to have made subsequent to the medication pass at 1014 hours.[30] The video recording of the unit appears to support the conclusion that Deputy Babich was not observing "each inmate."[31]

As stated previously in this report, this failure to observe each inmate calls into question the thoroughness of Deputy Babich's security rounds. It also calls into question whether he observed the window being covered on both the 1014 hours and 1107 hours security rounds. The video does not appear to show that he spoke with Mr. Herriges-Love, even to inform him to remove the shade when completed with using the toilet. While covering the window for a short period may be a method of being flexible, it must not be permitted to remain; but to enforce that rule, the officer must be more attentive to the duties than simply walking through the unit. Therefore, if inmates Jerry Pacquette and Joseph Piasecki accounts are accurate, then that would mean that Mr. Herriges-Love cell window

---

[27] "Security Rounds," Number 5.07 effective date 03/21/2016, p. 1

[28] Ibid, "Procedure," "A."p. 1

[29]

[30] Medication pass in Unit D-10 was recorded as occurring between 0930 hours and 0950 hours on 07/26/2017

[31] From 11:07:15 AM to 11:08:25 AM dated 07/26/2017

was covered for more than two hours without Deputy Babich having observed it being covered; requested it be taken down; or, he disregarded it being covered.

***Failure to Require Annual Suicide Prevention Training***

One of the key recommendations of Mr. Hayes report was the need for training officers in suicide prevention and intervention.

> "Second, it is strongly recommended that the MCSO maintain a 2-hour (an increase from 1-hour) annual block on suicide prevention that will be mandatory for all correctional, medical, and mental health personnel."[32]

I do agree with the need for annual refresher suicide training. The idea of the annual refresher training is to keep awareness of the issue of suicidal behavior in the forethought of the officers' minds. A one hour block is sufficient to accomplish this, if the officers actually are required to receive the training. The Macomb County Jail policy is fairly explicit in the need for this annual one hour training.

> "All corrections deputies will receive a minimum of one-hour suicide prevention refresher training annually. The suicide prevention training shall be conducted by staff with appropriate credentials and experience."[33]

This is a good policy; yet, a review of the training records for Deputy Babich does not indicate that he received the annual training. A review of the training records for Sergeant Horne also does not show the annual training; but Sergeant Horne was primarily assigned to the Patrol Division and not Corrections. I have not reviewed any documents indicating that annual in-service suicide prevention training was offered to all staff as mandated by the policy. Nor have I reviewed any documents indicating that the failure to obtain mandatory training resulted in some level of employee-employer disciplinary action.

It is good to offer a variety of topics during annual in-service training, including both elective topics and mandatory topics, such as suicide prevention. Failure to attend training in the elective topics is not as serious as failing to attend those topics that are mandated. Staff will typically delay attending training for as long as possible unless it is scheduled in such a way as to preclude that individual decision.

The Macomb County Jail's use of the "training days" is an excellent method for offering training without unduly impacting budgetary and staffing resources. Yet, even with what appears to be an effective system for providing staff training, there must be consequences for failing to attend mandated training. Every agency faces his issue. There is no record that Deputy Babich attended the annual suicide refresher training, if offered, or that he was disciplined for failing to do so. There is no documentation that the jail's training division provided the jail administration with a listing of those officers failing to attend the annual mandated training.

A reasonable correctional administrator must ensure that staff receive, at a minimum, the mandated training.

---

[32] "Technical Assistance Report on Jail Suicide Prevention Practices within the Macomb County Sheriff's Office," Lindsay M. Hayes, National Center on Institutions and Alternatives, 06/19/2002, p. 8

[33] "Suicide Prevention and Response," Number 5.11 effective date 03/14/2016, "Training," "B." p. 5

## XII. REPORT CONCLUSION

The Macomb County Jail, and the Macomb County Board of Supervisors, are both aware of the risks posed by the holes in the bunk beds. Following a critical incident, the conduct of the officers in the performance of their duties must be examined in light of available information to ensure that prior actions of those involved meet acceptable agency policy, procedures, customs and practices. Officers can, and must, use some discretion in the application of rules and regulations as long as that discretion does not place the inmate into a position of harm. Attendance to mandatory training, if only specified in policy, must be enforced by the use of appropriate human resource mechanisms when officers fail to attend.

I reserve the right to supplement or alter my opinion should additional information be received.

Donald L. Leach II

October 29, 2020

State of Utah
County of Salt Lake
Subscribed and sworn before me
On this 29 day of October
In the year 2020 by
Notary Public: Elizabeth Flowers

ELIZABETH FLOWERS
NOTARY PUBLIC • STATE OF UTAH
COMMISSION# 710676
COMM. EXP. 02-21-2024